# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

## CONCISE SUMMARY OF THE CASE

Pursuant to 3rd Cir. LAR 33.3, counsel are required to file a concise summary of the case within **14** days of the date of docketing of the Notice of Appeal. Total statement is limited to no more than 2 pages, single-spaced. Counsel may utilize this form or attach a 2 page statement encompassing the information required by this form.

SHORT
CAPTION:_____

USCA NO.: _____

LOWER COURT or AGENCY and DOCKET NUMBER:

_____

NAME OF
JUDGE:_____

Specify who is suing whom, for what, and the subject of this action. Identify (1) the nature of the action; (2) the parties to this appeal; (3) the amount in controversy or other relief involved; and (4) the judgment or other action in the lower court or agency from which this action is taken:

LIST and **ATTACH** a copy of each order, judgment, decision or opinion which is involved in this appeal. If the order(s) or opinion(s) being appealed adopt, affirm, or otherwise refer to the report and recommendation of a magistrate judge or the decision of a bankruptcy judge, the report and recommendation or decision shall also be attached.

Provide a short statement of the factual and procedural background, which you consider important to this appeal:

Identify the issues to be raised on appeal:

This is to certify that this Concise Summary of the Case was electronically filed with the Clerk of the U.S. Court of Appeals for the Third Circuit and a copy hereof served to each party or their counsel of record

this \_\_\_\_\_ day of _____,20\_\_\_\_\_.

_____

Signature of Counsel

Rev. 07/2015

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CAROLYN GARDNER** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.  22-1034** |
| | : | |
| **KUTZTOWN UNIVERSITY, et al.** | : | |

**<u>MEMORANDUM</u>**

**SCHMEHL, J.   /s/ JLS**                                                   **March  27, 2024**

This is another case where a tenured Associate Professor at Defendant

Kutztown University ("KU" or the "University"), claims the Defendants KU and its

President, Dr. Kenneth Hawkinson ("Dr. Hawkinson"), its Vice President for Equity,

Compliance, and Liaison for Legal Affairs, Jesus Pena ("Mr. Pena"), and its Director of

the Department of Human Resources, Jennifer Weidman ("Ms. Weidman") violated

Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794, as amended by the

Americans with Disabilities Amendments Act, 42 U.S.C. §12101, when they denied her

request for a remote work accommodation for the Fall Semester of 2021 and in the

Semesters thereafter.[1] Plaintiff claims that in denying her request, the Defendants

refused to consider her individual circumstances of being diagnosed with incurable

peripheral focal chorioretinal inflammation and panuveitis of both eyes that requires life-

long immunosuppressive medications to reduce her risk of going blind and which placed

her at a higher risk of contracting COVID-19. Instead, Plaintiff claims the Defendants

relied on a recently formulated blanket policy that **any** request to change the course

modality, office hours and meetings for the Fall 2021 Semester from in-person to

---

[1] See *Oross v. Kutztown University*, 2023 WL 4748186 (E.D. Pa. July 25, 2023).

remote would be considered a substantial alteration to the course offerings and would represent an undue hardship to the University.

Plaintiff has asserted claims against KU under the RA for failure to accommodate (Count One), facial invalidity of Defendants' Blanket Policy (Count Two), Intentional Discrimination because of Disability (Direct Evidence) (Count Three); Intentional Discrimination because of Disability (Pretext) (Count Four), Prohibited Standards, Criteria, or Methods of Administration (Count Five), and Retaliation and Interference (Count Six). Plaintiff has also asserted two claims against Dr. Hawkinson for Interference and Discrimination under the RA (Count Seven) and a claim under 42 U.S.C.§ 1983 for Retaliation for Deprivation of Rights under the RA (Count Eight), a claim against Mr. Pena under 42 U.S.C. §1983 for Violation of Plaintiff's Rights under the Rehabilitation Act (Count Eleven) and a claim against Ms. Weidman under 42 U.S.C. §1983 for Violation of Plaintiff's Rights under the Rehabilitation Act (Count Twelve).[2] Presently before the Court are Plaintiff's motion for partial summary judgment on Counts One, Two, Three, Five and the Interference part of Count Six and the Defendants' motion for summary judgment on all counts. For the reasons that follow, both motions are granted in part and denied in part.

## STANDARD OF REVIEW

A court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing

---

[2] There are no Counts Nine and Ten in the Complaint.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.* (citing *Anderson*, 477 U.S. at 248).

Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255. However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010). The movant bears the initial responsibility for informing the Court of the basis for the motion for summary judgment and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. After the moving party has met the initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c).

Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to

that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

"The same standards and burdens apply on cross-motions for summary judgment." *Allah v. Ricci*, 532 F. App'x 48, 50 (3d Cir. 2013) (citing *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987)). "When confronted with cross-motions for summary judgment ... 'the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard.' " *Transguard Ins. Co. of Am., Inc. v. Hinchey*, 464 F. Supp. 2d 425, 430 (M.D. Pa. 2006) (quoting *Marciniak v. Prudential Fin. Ins. Co. of Am.*, 184 F. App'x 266, 270 (3d Cir. 2006)). "If review of [the] cross-motions reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts." *Id.* (citing *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 302 (3d Cir. 1998)).

## **FACTS**

The parties have stipulated to the following facts[3]:

JSUF[Joint Stipulation of Undisputed Facts] 1: KU is one of the 14 universities in the Pennsylvania State System of Higher Education (PASSHE) with administrative offices at 15200 Kutztown Rd., Kutztown, PA. Complaint & Answer (Docs. 1 & 6), ¶5.

JSUF 2: KU is a program or activity that receives federal funds, and a covered employer under Section 504 of the RA. 29 U.S.C. §794 (b)(2). Docs. 1 & 6, ¶ 6.

JSUF 3: Dr. Hawkinson has been KU's President since 2015. Docs. 1 & 6, ¶7.

---

[3] Pursuant to the Court's Order of July 24, 2023 [ECF 60], the record for purposes of deciding the cross-motions for summary judgment is limited to the state of the record that existed when Plaintiff filed her motion for partial summary judgment on June 12, 2023 [Doc. 43].

JSUF 4: Mr. Peña is KU's Vice President for Equity, Compliance, & Liaison for Legal Affairs. Docs. 1 & 6, ¶8.

JSUF 5: Mr. Weidman is KU's Director of Human Resources. Docs. 1 & 6, ¶9.

JSUF 6: Professor Gardner came to KU as an Associate Professor in 2006 and was granted tenure in 2011. Docs. 1 & 11, ¶14.

JSUF 7: Professor Gardner attended graduate school at the New Mexico State University, where she earned a Master's Degree in Business Administration (MBA) in 1994, and then in 2002, a Doctor of Philosophy (Ph.D.) in Business Administration with a concentration in Management. Docs. 1 & 6, ¶15.

JSUF 8: Prior to coming to KU, Dr. Gardner served as Assistant Professor in the College of Business and Economics at Radford University in Radford, VA. Docs. 1 & 6, ¶16.

JSUF 9: During her years at KU, Dr. Gardner has taught a range of management courses. Docs. 1 & 6, ¶ 17; Exh. 79 at 38; Exh. 69 at 13.[4]

JSUF 10: According to materials published on KU's website, distance education is a "critical component to its mission to lead the University into the future." Docs. 1 & 6, ¶19.

JSUF 11: KU has a dedicated team of instructional designers, media producers, and technical support staff that collaborates with faculty "to ensure that the online experience reflects the rigorous education for which KU is known." Docs. 1 & 6, ¶20.

JSUF 12: Dr. Gardner completed KU's advanced online certification program in 2013. App. Vol. VI at 149; C.f., App. Vol. 7 at 176.

---

[4] Unless otherwise noted, all Exhibits refer to those contained in Plaintiff's Appendices [ECF 44-50].

JSUF 13: Between the fall 2006 semester and the conclusion of the 2020 fall semester, Dr. Gardner taught 38 classes online. App. Vol. VI at 150-156.

JSUF 14: For purposes of summary judgment, Defendants do not dispute that Dr. Gardner has a disability as defined by Section 504 of the RA. Exh. 74 at 95; Exh. 72 at 60.

JSUF 15: On December 17, 2020, Dr. Rajiv Shah (Dr. Shah") diagnosed Professor Gardner with peripheral focal chorioretinal inflammation and panuveitis of both eyes, an auto-immune condition for which there is no cure. Exh. 58; Exh. 82 at 10; 17; Exh. 69 at 46; 56.

JSUF 16: Dr. Shah is a specialist in inflammatory eye diseases and immunology in the Department of Diseases and Surgery of the Retina and Vitreous and Uveitis and Ocular Immunology at Wake Forest Baptist/Atrium Health Medical Center. He also serves as Assistant Professor of Ophthalmology at Wake Forest University School of Medicine. Exh. 82 at 8-10, 18.

JSUF 17: Dr. Shah's medical records say that he explained to Professor Gardner that her disease was vision-threatening and potentially blinding.

JSUF 18: After the Governor of Pennsylvania announced a state of emergency due to the Covid-19 virus, KU, along with most other institutions of higher education (IHEs) in the state, had to discontinue all in-person instruction by March 16, 2020. Docs. 1 & 6, ¶¶ 24.

JSUF 19: In response, KU temporarily delivered courses in an online format and faculty held office hours online, and conducted faculty and committee meetings remotely. Docs. 1 & 6, ¶ 25; App. Vol. III at 42; Exh. 70 at 129.

JSUF 20: During the 2020 Spring semester, Dr. Gardner was teaching in-person sections of Gender & Diversity (MGM 318), International Management (MGM 352), and Business and Case Social Environment (MGM 360); these classes were converted to remote modality when the shut-down took place.

JSUF 21: Dr. Gardner was also supervising Independent Study (Bus 379) and an Internship in Business (Bus 390); these classes were converted to an online modality when the shut-down took place.

JSUF 22: The state of emergency in Pennsylvania remained in force until June 15, 2021. Docs. 1 & 6, ¶ 27.

JSUF 23: KU moved ahead with the reopening plan [for the Fall 2020 Semester] where accommodation standards were relaxed for staff and faculty resulting in approximately 67% of KU's courses being offered online. Docs. 1 & 6, ¶29.

JSUF 24: The Centers for Disease Control ("CDC") considers people with immune compromise to be at significantly elevated risk for serious illness or death from Covid-19. See Docs. 1 & 6, ¶31.

JSUF 25: Pursuant to the CDC's guidance, "severe illness" encompasses the need for hospitalization, intensive care, a ventilator, or may result in death. Docs. 1 & 6, ¶30.

JSUF 26: According to the CDC, people at increased risk of severe illness or death, and those who live or visit with them, need to take precautions to protect themselves from getting COVID-19. Docs. 1 & 6, ¶32.

JSUF 27: Under the Governor's order, high-risk faculty during the 2020-21 academic year were entitled to flexible work arrangements whether or not they

would also qualify as people with disabilities eligible for reasonable accommodations under federal or state disability law. Docs. 1 & 6, ¶33.

JSUF 28: Dr. Gardner requested and was granted a flexible work arrangement for the Fall 2020 Semester, and taught all of her courses synchronously online. Docs. 1 & 6, ¶35.

JSUF 29: Under KU's Course Design Principles and Models, synchronous online instruction takes place 100% remotely using Zoom or other video conferencing software, which allows for virtual communication between instructors, students, and colleagues in real time. Docs. 1 & 6, ¶36; see also App. Vol. VI (No. 13); Exh. 22.

JSUF 30: [Pursuant to her Flexible Leave Arrangement], Professor Gardner continued teaching her full course load synchronously online for the first half of the 2021 spring semester. Docs. 1 & 6, ¶40.

JSUF 31: Dr. Shah provided certification that Dr. Gardner was immunosuppressed, and needed time to adjust to the medication. On or about March 23, 2021, Professor Gardner applied for and was granted FMLA leave [ ] from March 23, 2021 through May 7, 2021 due to "incapacitating fatigue from medications." Docs. 1 & 6, ¶42; see also Exh. 31 at 1-2.

JSUF 32: In March, 2021, Dr. Hawkinson issued a "Guide for Fall Semester: Covid-19 Information,"stating that KU would be returning to a primarily face-to-face environment. Docs. 1 & 6, ¶43.

JSUF 33: Under KU's published re-opening plan, classrooms would return to their pre-Covid configurations, which would not allow for social distancing. Professors could ask students to wear a mask, but could not require them to use one.

Vaccinations were encouraged but not mandatory, and there was no protocol for mandatory testing that would ensure that infected students and staff not enter campus buildings and classrooms. Docs. 1 & 6, ¶60.

JSUF 34: Under Dr. Hawkinson's directive, classrooms would "closely resemble pre-Covid configurations," and employees were expected to return to work on campus, and faculty would be required to conduct office hours in person. Docs. 1 & 11, ¶44.

JSUF 35: Dr. Hawkinson's "Guide for Fall Semester" was re-published on or about August 8, 2021.

JSUF 36: Dr. Hawkinson's directive strongly encouraged vaccination, but did not require it. Students were encouraged, but not required, to update KU about their vaccination status. Masks would be required indoors, but there would be no social distancing requirements on campus. Docs. 1 & 11, ¶46.

JSUF 37: In the Frequently Asked Questions ("FAQs") that accompanied the Fall Semester Covid-19 Guide, Dr. Hawkinson stated that faculty would be required to conduct office hours in-person. Docs. 1 & 11, ¶ 45.

JSUF 38: The language "conducting office hours is an essential function of the job of an Associate Professor" does not appear in the governing union contract. App. Vol. VI (No. 3).

JSUF 39: During a meeting in late July or early August, 2021, Mr. Peña and Ms. Weidman concluded that converting in-person classes to online was not a reasonable accommodation for the University. Docs. 1 & 6, ¶ 50.

JSUF 40: KU Policy DIV-002 governs the processing and disposition of requests for "Reasonable Accommodation for Employees." Docs. 1 & 6, ¶73; App. Vol. VI, (No. 14).

JSUF 41: Responsibility for the implementation of KU Policy DIV-002 rests with the Director of Disability Services Office ("DSO"), as well as Ms. Weidman, Mr. Pena and designated staff members. Docs. 1 & 6, ¶ 74; see App. Vol. VI (No. 15).

JSUF 42: Both Ms. Weidman and the Director for DSO report directly to Mr. Peña, and he reports to Dr. Hawkinson. Docs. 1 & 6, ¶75.

JSUF 43: As described on its website, an employee initiates KU's process for "Requesting Employee Accommodations" by submitting a request to the Director of DSO, along with medical documentation to establish that they have a disability as defined by federal and state disability law, i.e., the Americans with Disabilities Act, Section 504 and/or the Pennsylvania Human Relations Act. Docs. 1 & 6 , ¶70.

JSUF 44: If the DSO Director concludes that the employee's medical documentation is sufficient to show a disability, she communicates this to HR Director Weidman with a description of the requested accommodation. Docs. 1 & 6, ¶71.

JSUF 45: Although DSO determines whether an employee has a medical condition that qualifies them to move forward with the accommodation process, it does not make the decision as to whether an accommodation will be granted or denied. Docs. 1 & 6, ¶72.

JSUF 46: DIV-200 requires that all accommodation requests be evaluated on an individual basis to determine whether the provision of such accommodation would create an undue hardship to KU. Docs. 1 & 6 , ¶76; see also App. Vol. VI (No. 16).

JSUF 47: The policy provides that if the employee has a qualifying disability and with or without reasonable accommodations, can perform the essential functions of a position, a reasonable accommodation, if available and not creating an undue hardship to KU, should be provided. Exh. 11; Exh. 75 at 49.

JSUF 48: The first day of classes for the 2021 Fall Semester was August 30, 2021. Docs. 1 & 6, ¶63.

JSUF 49: On August 20, 2021, Professor Gardner submitted a request for accommodation to the DSO seeking a synchronous remote work accommodation. Docs. 1 & 6, ¶64; see also Exh. 1.

JSUF 50: In support of Dr. Gardner's request, Dr. Shah submitted a letter dated August 20, 2021, to DSO explaining that Professor Gardner requires immunosuppressive medications to reduce the risk of vision loss, which makes her susceptible to contracting illnesses and possibly suffering more severe symptoms of illnesses. The letter recommended that Professor Gardner "begin/continue to work remotely for teaching, office hours, and meetings." Docs. 1 & 6, ¶65. See also Exh. 1 at 4-5.

JSUF 51: On August 21, 2021, the Director of DSO e-mailed Ms. Weidman informing her that Plaintiff had submitted documentation of a medical condition and had requested an accommodation to perform all of her work remotely. Docs. 1 & 6, ¶ 79.

JSUF 52: According to KU's Human Resources website, the HR Director will work closely with the employee's supervisor, manager, chair and/or Dean to gather the relevant information necessary to respond to the request and assess whether a

particular accommodation will be effective, and "may convene a meeting to continue the interactive process to discuss the requested accommodation as well as alternative accommodations that may be effective in meeting the requester's needs." Exh. 25 at 6.

JSUF 53: The responsibility for conducting what KU defines as the "interactive process" is ordinarily delegated to the Employee Relations Manager, who at all relevant times has been Alexis Martin ("Ms. Martin"). App. Vol. VI (No. 17).

JSUF 54: On August 26, 2021, Ms. Weidman denied Professor Gardner's request for a synchronous remote work accommodation, stating:

> Your accommodation request (as listed/written above) for Fall 2021 is denied, as converting your three face-to-face courses to an online modality is a fundamental alteration of the course delivery. Your request to maintain office hours and conduct/attend meetings remotely is also denied, as this is also a fundamental alteration to how these duties are conducted, and the service/product expected from our students. The University has a duty to students who have signed up for and expect face-to-face classes to be delivered in that modality unless and until directed by commonwealth authorities to discontinue face-to-face instruction.

JSUF 55: Ms. Martin did not speak with Dr. Gardner about her accommodation request. Exh. 76 at 16.

JSUF 56: Ms. Weidman did not speak with Dr. Gardner about her Request for Reasonable Accommodation form. Exh. 74 at 16-17.

JSUF 57: The Dean of the College of Business, Dr. Anne Carroll ("Dean Carroll"), was not involved in the determination of Dr. Gardner's request for remote work in

Fall of 2021, and therefore provided no objection to her request. App. Vol. VI (No. 8).

JSUF 58: The Chair of Professor Gardner's Department, Dr. Gary Chao ("Dr. Chao"), was not involved in the determination of [her] request for remote work in Fall 2021, and therefore provided no objection to her request. App. Vol. VI (No. 9).

JSUF 59: Ms. Martin prepared the Resolution Form for Ms. Weidman's signature and sent it to her on August 25th for approval, noting that the request is "denied as requested." Exh. 76 at 27; Exhs. 13 at 2 & 15 at 1.

JSUF 60: Ms. Martin used the template Ms. Weidman and Mr. Peña instructed her to use on all faculty requests seeking remote work accommodations for courses that were previously scheduled to be held in person. App. Vol. VI (No. 20); Exh. 75 at 57; Exh. 76 at 16; Exh. 77 at 13; 20-21, 37, 43.

JSUF 61: Ms. Martin used the same basic template to prepare denials for all the remote work accommodations for the fall semester. App. Vol. VI (Nos. 19-20); Exh. 77 at 43; Exh. 16; App. Vol. V at 119; App. Vol. VII at 199.

JSUF 62: The University has no policy calling for the denial of employee requests for reasonable disability-based accommodations on the ground that it "fundamentally alters" any of the University's course offerings, services or methods of operation or administration. App. Vol. VI (No. 21).

JSUF 63: Allowing Dr. Gardner to teach her 2021 fall semester courses online would not have entailed significant expense to the University, and was not infeasible technology-wise; neither of these reasons were cited by KU in the denial and that is

not why it was denied. Exh. 73 at 67; Exh. 74 at 22; Exh. 75 at 93; Exh. 76 at 30-31; Exh 79 at 16, 31-32; Exh. 80 at 22, 33. See also App. Vol. VI (No. 10).

JSUF 64: New technology had been recently installed across campus which "allows [ ] for synchronous instruction for Fall 2020 and beyond." App. Vol. IV, at 34.

JSUF 65: 13 per cent of KU's course offerings for the 2021 Fall Semester were fully online. Another 10% were delivered at least partially online. Exh. 33 at 7; Exh. 34 at 1.

JSUF 66: For the fall semester, Professor Gardner was scheduled to teach three of her classes in-person and one online. Docs. 1 & 11, ¶ 56.

JSUF 67: Prior to the 2021 Fall Semester, she had taught Human Resources Management (MGM 335) in a remote modality 3 times.

JSUF 68: Dr. Gardner was scheduled to teach two sections of Business and Social Environment (MGM 210), one in-person and the other online.

JSUF 69: Prior to the 2021 Fall semester Professor Gardner had taught Business and Social Environment sixteen times online, and also converted two sections from in-person to online when the COVID-19 shutdown occurred in March, 2020. App. Vol. VI at 150-53.

JSUF 72: On September 10, 2021, Dr. Hawkinson issued an "Update" on Covid-19 issues after it "came to our attention that some members of our community have been planning a demonstration to protest the university's Covid-19 protocols." Docs. 1 & 11, ¶99.

14

JSUF 73: Dr. Hawkinson said that his reopening plan was fully within the COVID- 19 guidance from governmental authorities, including the CDC and other health experts. Docs. 1 & 11, ¶100.

JSUF 74: At that time, CDC's "Guidance for "IHEs" recommended "options for accommodations, modifications, and assistance to students, faculty, and staff at increased risk for severe illness that limit their exposure to risk and allow for education and or work opportunities (such as virtual learning, telework, and modified job responsibilities, including work-related meetings and gatherings). Docs. 1 & 11, ¶103.

JSUF 75: Classes were scheduled to start for the 2022 spring semester on January 24, 2022. Docs. 1 & 6, ¶104.

JSUF 76: On January 5, 2022, Professor Gardner submitted a request for reasonable accommodation to DSO for the spring semester for a synchronous remote teaching schedule as an accommodation for her disabilities, and to hold her office hours and attend meetings remotely. Docs. 1 & 6, ¶106.

JSUF 77: This was substantively the same accommodation request that Professor Gardner made in her previous accommodation request for the Fall 2021 semester in August 2021.

JSUF 78: In response the DSO Interim Director, McKenzie Hollenbach (Ms. Hollenbach"), advised Dr. Gardner via e-mail that "[t]he next step in the employee accommodation request process is to schedule a meeting with me, so that we can have an interactive discussion regarding your request for accommodations. During our meeting, I will gather information and we will discuss what would be an effective

accommodation. After our meeting I will forward your request to the Assistant Vice President for Human Resources, who is responsible for responding to the request. . . . Please be aware, the [DSO] does not make final determination regarding employee reasonable accommodations. . ." Exh. 4 at 1; Docs. 1 & 6, ¶ 107.

JSUF 79: During a meeting with Ms. Hollenbach on January 10, 2022, Professor Gardner stated that she needed a remote teaching accommodation because her immunosuppressing medications "place her at higher risk for contracting the new variant of Covid-19." Exh. 5 at 4.

JSUF 80: DSO had no authority to determine whether to grant Professor Gardner's request for a remote accomodation, and no one from HR attended the "interactive meeting." Docs. 1 & 6, ¶109.

JSUF 81: After the meeting on January 10, 2022, Ms. Hollenbach reported to Ms. Weidman in an E-mail that Dr. Gardner had "submitted documentation of a medical condition and ongoing medical treatment that causes her immune system to be suppressed and makes her more susceptible to contracting illnesses." And as recommended by her medical provider, she was "requesting to work remotely using synchronous Zoom for teaching, office hours, and meeting attendance." Exh. 5 at 2; Exh. 74 at 26.

JSUF 82: On January 12, 2022, without meeting with Professor Gardner, Ms. Weidman denied her request on the same ground that she denied the previous one, i.e., that converting her three face to face courses to an online modality is a "fundamental alteration of the course delivery," as would conducting office hours online. Docs. 1 & 6 ¶110, See also Exh. 6 at 3; Exh. 74 at 49.

16

JSUF 83: The form also stated that as an Associate Professor, "in- person teaching is an essential function of your job." Docs. 1 & 6, ¶111.

JSUF 84: There is no policy, contractual definition, or pre-existing job description defining "full duty" for an Associate Professor, much less one stating that teaching in-person in the classroom is an essential function of the job. Docs. 1 & 6, ¶112.

JSUF 85: Allowing Dr. Gardner to teach her 2022 spring semester courses online would not have entailed significant expense to the University and was not infeasible technology-wise; neither of these reasons were cited by KU in the denial. Exh. 73 at 67; Exh. 74 at 22; Exh. 75 at 93; Exh. 76 at 30.

JSUF 87: Professor Gardner had four courses on her spring roster, one online and three in-person. Docs. 1 & 6, ¶105.

JSUF 88: Dr. Gardner was scheduled for two sections of Business and Social Environment (MGM 360), one in-person and one online. App. Vol. VI at 156.

JSUF 89: Prior to the Spring semester, she had taught Business and Social Environment eighteen times online. App. Vol. VI at 150-56.

JSUF 90: Dr. Gardner was scheduled to teach Human Resources Management (MGM 335) in-person. App. Vol. VI at 156.

JSUF 91: Prior to the Spring semester, Professor Gardner taught Human Resources Management synchronously three times during the 2020-21 academic year. App. Vol. 6 at 150-56.

JSUF 92: Dr. Gardner was scheduled to teach a Senior Seminar (MGM 380) in-person. App. Vol. 6 at 156.

JSUF 93: Prior to the Spring semester, Professor Gardner taught the Senior Management Seminar twice, both times in online modalities. App. Vol. VI at 150-56.

JSUF 94: Dean Carroll was not involved in the determination of Dr. Gardner's request for a remote work accommodation for the spring 2022 semester, and therefore provided no objection to her request. App. Vol. VI (Nos. 10-12); see also Exh. 79 at 40; 43; 78.

JSUF 95: Dr. Chao was not involved in the determination of [her] request for remote work accommodation for the spring 2022 semester, and therefore provided no objection to her request. App. Vol. VI (Nos. 10-12); see also Dep. 20 at 3; Exh. 80 at 30-31.

JSUF 96: When Ms. Weidman denied Dr. Gardner's accommodation request on January 12th, she offered an "alternative accommodation" that would allow her to teach behind a plexiglass shield and wear a face shield. Docs. 1 & 6, ¶ 118.

JSUF 97: This alternative accommodation was not discussed during Dr. Gardner's January 10, 2022 meeting with Ms. Hollenbach. Exhs. 5 at 4; 8 &42; Exh. 74 at 40.

JSUF 98: On January 14, 2022, Professor Gardner rejected Ms. Weidman's alternative proposal stating that it was "not a reasonable accommodation." Exh. 7 at 1 & 5.

JSUF 99: By then, COVID-19 cases were on the rise, but testing and vaccination and testing were still optional and classrooms had returned to pre-pandemic configurations, leaving no room for social distancing. Outside the classroom, social distancing was still not mandatory, and the modifications CDC had recommended to

make HVAC systems safer for students and staff still had not been made. Docs. 1 & 6, ¶120.

JSUF 100: KU's "Quarantine, Isolation and Remote Work Protocols" for the spring semester were published on January 14th, allowing faculty who test positive to convert instruction from in-person to synchronous via Zoom for up to ten days. Docs. 1 & 6, ¶121.

JSUF 101: The same day, through her counsel, Professor Gardner attempted to resolve the spring semester accommodation dispute before classes began on January 24th, and to secure restoration of the FMLA and sick time she had been forced to use during the fall semester because her request for accommodation had been denied. Docs. 1 & 6, ¶122.

JSUF 102: On January 19, 2022, counsel from PASSHE told Plaintiff's counsel that the accommodation request was properly denied. Docs. 1 & 6, ¶123.

JSUF 103: Meanwhile, in December 2021, KU asked Professor Gardner to submit a new FMLA Employee Serious Health Condition Certification. She provided this Certification, which was completed by Dr. Shah, on February 8, 2022. Exh. 31 at 7-8.

JSUF 104: Dr. Shah's Certification stated that Dr. Gardner required vision-saving immunosuppression therapy, and her current medication caused her to be immunocompromised, and that he does not recommend in-person classes given her immunocompromised state. The certification further stated that he recommended that she be allowed to work remotely and that she can perform her job via remote access. *Id*.

JSUF 105: In an E-mail on February 21, 2022:

From: Weidman, Jennifer
Sent: Monday, February 21, 2022 3:12 PM
To: Gardner, Carolyn Cc: Hollenbach, McKenzie Subject: Future accommodation requests

> Good afternoon, Dr Gardner,
> In the interest of future planning, please advise if you intend to again request accommodation for the Fall 2022 semester. If you plan to do so, please provide notice to the Disability Services Office, as well as indicating if the accommodations requested will remain the same. If there is no change to the accommodations requested, there is no need to submit a new request form at this time; only the notice is needed. Should you wish to change the accommodation requested, please submit a new request form. Again, that should be sent to the Disability Services Office at dso@kutztown.edu. Since you just provided updated medical documentation in association with your FMLA paperwork, no updated medical is required at this time for ADA accommodation purposes, although another update will be requested again in the late summer.
>
> Regards, Jennifer

Exh. 9; see also Exh. 78 at 60-61.

JSUF 106: HR has no authority or direct involvement in academic planning. Exh. 74 at 67; Exh. 76 at 41. See also Exh. 75 at 39; 147; Exh. 72 at 45.

JSUF 107: After receiving Ms. Weidman's February 21st correspondence-mail, Dr. Gardner responded the following day stating, "Thank you for responding with the information on my FMLA status. As I responded last month, I am represented by Ms. Lorrie McKinley, [counsel's e-mail], I will again request you include her on correspondence on this legal matter until it is resolved." App. Vol. VII at 208.

JSUF 108: Later that day (February 22, 2023), HR informed Dr. Gardner that her sick leave balance was 525 hours, and she needed 423.75 to get through the semester. App. Vol. VII at 207.

JSUF 109: By way of an e-mail to both Ms. Hollenbach and Ms. Weidman, Dr. Gardner submitted a request for accommodation for the 2022 Fall Semester on March 31, 2022 to work remotely using "current technology to teach face-to-face classes. The class modality will not change. The students will be able to attend class in the assigned classroom and I will use Zoom or other technology to teach in the same room with the students." Exh. 10.

JSUF 110: This was substantively the same accommodation request that Professor Gardner had made in her previous two accommodation request forms: for the Fall 2021 semester in August 2021 and for the Spring 2022 in December 2021.

JSUF 111: The supporting letter from Dr. Shah was largely identical to the previous letters that had been submitted with Dr. Gardner's two previous accommodation requests.

JSUF 112: On April 1, 2022, Ms. Hollenbach e-mailed Dr. Gardner as follows:

> Good Afternoon Carolyn,
> Thank you for sending your Request for Reasonable Accommodations, as well as the most current letter from your doctor.
> I sent Jennifer Weidman from HR an email to let her know the DSO has received your request for reasonable accommodations, as well as a letter from your care provider.
> Sincerely,

Exh. 29; Exh. 78 at 40. See also Exh. 74 at 61-62; 69.

JSUF 114: Professor Gardner E-mailed Ms. Weidman on April 7th and April 14th requesting a status report on her fall accommodation request; the e-mail was cc'd to Ms. Hollenbach. Exh. 30.

JSUF 115: Ms. Weidman, who was by now aware of the lawsuit Dr. Gardner had filed, did not respond to either of Dr. Gardner's E-mails.

JSUF 116a: On April 15, 2022, Ms. Hollenbach e-mailed Dr. Gardner as follows:

> Dear Carolyn,
> I'm reaching out to follow-up with you regarding your request for reasonable accommodations. After a review of the materials you provided, additional medical documentation is required to properly evaluate your request. The documentation should include the following information:
> 1. Onset date of the medical condition, specifically peripheral focal chorioretinal inflammation of both eyes
> 2. Description of current treatment methods, including name and onset date of medication causing immunosuppression
> 3. Description of level of immunosupression and affect on daily life activities
> 4. Length of time anticipated for the medical condition of peripheral focal chorioretinal inflammation
> 5. Length of time anticipated to be on medication causing immunosupression

Prior to April 15, 2022, DSO had never advised Dr. Gardner that the medical documentation she submitted from her doctor in support of her requests for accommodation were in any way insufficient. Exh. 78 at 56. Dr. Gardner responded on April 25, 2022:

> Hello McKenzie,
> You may not be aware, although Jennifer certainly is, that I am represented by counsel in connection with KU's handling of my requests for accommodation, and my entitlement for the fall semester is one of the issues in my pending lawsuit. Obviously, any communications from KU pertaining to any of those issues have to be addressed to my attorneys. They have a lot of concerns about your 4/15 E-mail which they will

be raising with KU's counsel. In the meantime, they have authorized me to provide only the attached FMLA documentation, which HR certainly has, but maybe you have not seen. There has never been any question about my disability, and that is not why my accommodation requests have been denied. Jennifer said in her February 22nd E-mail that it was not necessary for me to provide any further information unless my medical situation had changed, and it has not, or if my request for accommodation was somehow different, which it isn't.
Sincerely,
Carolyn

In response, Ms. Hollenbach e-mailed:

Dear Carolyn,
Thank you for reaching out.
In response to your email, I will defer to your attorney and KU's counsel in addressing my April 15th, 2022 email.
Sincerely,
McKenzie Hollenbach

JSUF 117: In an E-mail on April 26, 2022 to Deputy Attorney General Kathy Le, who was then representing KU in the recently filed lawsuit, Plaintiff's attorney attached the FMLA paperwork that Dr. Gardner sent to DSO the day before. (Exh. 31). The e-mail concluded with the following: "Please let me know if you would like to discuss this any further. Otherwise, please advise DSO and HR to send any further inquiries regarding her disability status through counsel." Vol VII at 211.

JSUF 118: Dr. Gardner filed for a Temporary Restraining Order (TRO) on August 17, 2022 seeking an order pendente lite requiring KU to provide her with a remote work accommodation for the 2022 Fall semester. ECF Doc. 16.

JSUF 119: On August 22, 2022, the Court denied the TRO on the ground that Dr. Gardner would not suffer irreparable harm absent temporary restraints and that Dr.

Gardner was seeking mandatory affirmative relief to her current conditions of employment. ECF Doc. 22; Exh. 44; see also App. Vol. VII at 213-15.

JSUF 120: As described in a letter from HR Generalist Debora Longenhagen on October 3, 2022, Dr. Gardner had been "approved" for extended Leave Without Pay (LWOP) from October 19, 2022 through July 25, 2023. However, she would "lose her right to return to [her] position" if she remained on extended LWOP after 12:00 a.m. on April 18, 2023, at which time she would also lose her entitlement to benefits.

JSUF 121: On Friday, December 2, 2022, Dr. Gardner submitted to Ms. Hollenbach a request for a remote work accommodation for the 2023 Spring semester. Exh. 45.

JSUF 122: This was substantively the same accommodation request that Professor Gardner had made in her previous three accommodation requests for the Fall 2021 semester in August 2021, for the Spring 2022 semester in December 2021, and for the Fall 2022 semester in March 2022.

JSUF 123: Dr. Gardner provided her September 13, 2022 FMLA Medical Certification signed by Dr. Shah which provided the onset date of her autoimmune condition, her current treatment with immunosuppressing medication, and his recommendation that she work remotely. Exh. 43.

JSUF 124: In a letter E-mailed on December 6, 2022 entitled "Updated Leave Information," Ms. Weidman advised Dr. Gardner that she would have limited return to work rights if her absence continued beyond 12:00 a.m. on January 24, 2023, at which time she would also lose her entitlement to State System medical or life insurance benefits. Exh. 46 at 2; Exh. 74 at 89.

JSUF 125: The letter noted she could enroll in the State System's Affordable Care Act health plan at her own expense.

JSUF 126: On December 15, 2022, Dr. Gardner submitted to Ms. Hollenbach an updated letter from Dr. Shah which was dated December 8, 2022, but was otherwise identical to his previous letter on January 6, 2022 setting forth her diagnosis, her treatment with immunosuppressing medications for an indefinite period of time, and his recommendation that she work remotely as a "dire" precaution to protect her overall wellbeing due to her being immunocompromised. Exh. 57.

JSUF 128: On December 20, 2022, Ms. Weidman wrote to Dr. Gardner and the plaintiffs in the two related cases offering an alternative accommodation in a classroom to be converted from a computer lab with a separate entrance, a cap of 35 students, additional ventilation and air exchange, including two portable air scrubbers with both HEPA and MERV filters and bi-polar ionization unit on the heat pump used for the space, reduced foot traffic, and an ADA-compliant instructor podium, enclosed on three sides with a plexiglass shield. The deadline for accepting or rejecting the proposed alternative was the close of business on December 22nd, which was when the University was closing for the holidays until January 3, 2023. Exh. 48; Exh. 74 at 97-98.

JSUF 129: Dr. Gardner responded to Ms. Weidman on December 22, 2022, asking for additional information about the proposed new classroom that she believed her doctor would need to evaluate the safety of the proposed alternative accommodation. Exh. 48 at 2.

JSUF 130: On December 28, 2022, Dr. Gardner filed a second Motion for a TRO requiring KU to provide her with a remote work accommodation for the Spring Semester and/or to preclude them from terminating her work return rights and medical benefits at midnight on January 24, 2023. ECF Doc. 34.

JSUF 131: Ms. Weidman responded on January 3, 2022, and thereafter exchanged E-mails and additional information with Dr. Gardner between January 5th and 16th. Exhs. 49-50.

JSUF 132: Pursuant to a hearing on Dr. Gardner's application for a TRO on January 12, 2023, Dr. Gardner was ordered to provide another letter from Dr. Shah specifically pertaining to whether the proposed alternative accommodation would be a safe and effective accommodation for her disability.

JSUF 133: On January 18, 2023, Dr. Gardner submitted a letter from Dr. Shah stating that Defendant's alternative accommodation, while helpful, was not sufficient to protect her from contracting COVID-19 and its potential consequences due to her immunosuppressed condition, and reiterating his recommendation that she work remotely. Exh. 58.

JSUF 134: On January 19, 2023, Dr. Gardner formally rejected Kutztown's alternative accommodation.

JSUF 135: On January 23, 2023, the Court entered a preliminary injunction enjoining Defendants from terminating Dr. Gardner's employment benefits and right to return as a tenured professor without further Order of the Court. The injunction was to expire on July 25, 2023. ECF Doc. No. 41.

JSUF 136: Because of the TRO, Dr. Gardner's current work status is extended leave without pay with benefits (medical and life insurance).

JSUF 137: Since the 2021 Fall Semester, there has been no change to KU's policy that faculty requests to convert in-person classes to online modality would cause undue hardship on the University because of the "fundamental alteration to the service provided to students under the University's business model as an in-person institution." App. Vol. VI (No. 28).

JSUF 138: Since the 2021 Fall Semester, KU has never allowed an accommodation in the form of a 100% remote teaching for any fulltime faculty.

**PLAINTIFF'S SUPPLEMENTAL UNDISPUTED FACTS**

The Court also makes the following factual findings from Plaintiff's Statement of Supplemental Facts[5] (ECF 52-1):

1. Dr. Gardner sought treatment and diagnostic services at Wills Eye Hospital between February, 2019 and October, 2020 due to vision issues involving her left eye. App. Vol. VII.

2. Dr. Shah testified that in December of 2020, he started Plaintiff on immunosuppressing medications. ECF 49-6 at 16-21. According to Dr. Shah, "all immune suppression falls under the category of chemotherapy." *Id*. at 21.

---

[5] Defendants object to Plaintiff's citations to depositions from the *Oross* case on the basis that both cases are factually distinct. The Court does not agree. While there are, of course, certain individual facts about Mr. Oross that are distinct to the *Oross* case, both cases arise out of the University's alleged blanket policy that any request to change the course modality from in-person to remote for the Fall 2021 Semester and thereafter would be considered a substantial alteration to the University's course offerings and would represent an undue hardship to the University. Indeed, in the parties' joint discovery plan, the parties agreed that the depositions of Ms. Martin, Ms. Weidman, Mr. Pena and Dr. Hawkinson in this case, would be "considerably shortened because they have already been deposed in the [*Oross*] case." ECF 14.

3. Dr. Gardner has been taking immunosuppressing medications since approximately December 29, 2020. Exh. 70 at 60; Ex 82 at 18-21.

4. Dr. Gardner's immune system is suppressed due to the drugs she needs to manage her autoimmune condition. Exh. 58; Exh. 74 at 28-29, 69-95; Exh. 78 at 40.

5. Because of the suppression of her immune system, Dr. Gardner was at high risk for severe illness or death if she contracted COVID-19 in the Fall of 2021. Exh. 58; Exh. 82 at 28.

6. Other than imposing that Dr. Gardner teach, conduct office hours and hold meetings online, Dr. Shah did not impose any other restrictions on Dr. Gardner's ability to perform her position as Associate Professor. Exh. 1 at 1.

7. The issue of Dr. Gardner's medical condition being a disability "has never been an issue" for KU. Exh. 49 at 3: Exh. 72 at 60; Exh. 74 at 95.

8. Under the Collective Bargaining Agreement ("CBA"), the evaluation of faculty members at the University consists of three categories: effective teaching, scholarship and service to the University. CBA Article 4 and Article 12 (ECF 52-1 at pp. 13-16); Exh. 79 at 17-18.

9. Dr. Hawkinson's plan for the Fall Semester of 2021 was to require all faculty to return to work in-person, without exception. Exh. 71 at 15-16; 23-24, 146.

10. Dr. Hawkinson intended for there to be no changes in course modality for the Fall Semester of 2021. Exh. 71 at 41, 65, 213; Exh. 70 at 27; Exh. 64 at 3; App. Vol. 4 at 53.

11. Dr. Hawkinson testified that he did not believe there was a protocol at the University to allow employees not to come back to work in-person due to COVID-19 concerns. Exh. 71 at 23, 146.

12. Faculty at the University have the authority to conduct office hours on campus or online, depending on student needs or preferences. App. Vol. VI at 127 (No. 3).

13. Dr. Hawkinson and Ms. Weidman testified that for the Fall Semester of 2021, each was aware that the CDC's "Guidance for "IHEs" recommended options for accommodations, modifications and assistance to students, faculty and staff at increased risk for severe illness that limit their exposure to risk and allow for education and or work opportunities (such as virtual learning, telework, and modified job responsibilities). Exh. 71 at 81; Exh. 75 at 66.

14. After Dr. Gardner's accommodation request for the Fall 2021 Semester was denied and her FMLA eligibility expired on October 20, 2021, her only option for maintaining her full-time active employment status at the time was to use her accrued paid leave.

15. The plexiglass shield that Ms. Weidman offered to Dr. Gardner was not based on Dr. Gardner's specific condition but was generally offered to all faculty who wanted to convert in-person classes to a virtual modality. Exh. 14 at 4; Exh. 76 at 32-33; Exh. 74 at 40.

16. After her second accommodation request was denied on January 12, 2022, Dr. Gardner was left with only her one online class and her only option for maintaining her full-time paid leave status at the time was to continue using her accrued paid leave to cover 75% of her salary.

17. Ms. Weidman testified that although there had been no change in KU's "interpretation that converting classes from in-person to online is not a reasonable accommodation," by March 7, 2022, KU had "begun the process of reaching out proactively to look forward to the fall to try and schedule accordingly to avoid that issue." Exh. 75 at 143; Exh. 74 at 58.

18. In March 2022, Ms. Weidman became aware of this lawsuit, which had been filed on March 17, 2022. Exh. 74 at 70.

19. In April, 2022, Ms. Weidman directed Ms. Hollenbach to ask Dr. Gardner for additional medical information. App. Vol. VII at 209.

20. Ms. Weidman testified that she does not supervise DSO and has no role in determining whether an employee has a qualifying disability. Exh. 74 at 28.

21. On April 15, 2022, Ms. Hollenbach asked Dr. Gardner to provide additional medical information pertaining to the nature and extent of her disability, including the onset date, description of current treatments, description of level of immunosuppression, length of time for the condition and length of time to be on medication. Exh. 30.

22. Prior to April 15, 2022, DSO had never advised Dr. Gardner that the medical documentation she submitted from her doctor in January of 2022 was inadequate. Exh. 78 at 56.

23. Having already confirmed Dr. Gardner's disability status and having sent her accommodation request to HR in January, 2022, DSO no longer had jurisdiction over the processing of Dr. Gardner's request, nor did it have any role as to

whether the request would be approved or denied. Exh. 72 at 40; Exh. 74 at 29, 69; Exh. 78 at 37, 40-44.

24. Ms. Weidman testified that DSO did not advise HR that it needed any further medical information. Exh. 74 at 65.

25. On April 25, 2022, in response to DSO's April 15, 2022 email requesting more medical documentation, Dr. Gardner wrote that because the request for additional information pertained to issues in her pending lawsuit, her attorneys would be communicating about it directly with defense counsel. However, she did provide copies of her FMLA medical certifications. Exh. 29; Exh 30; Exh. 31.

26. In an email to defense counsel dated April 26, 2022. Plaintiff's attorney attached the FMLA paperwork that Dr. Gardner sent to Ms. Hollenbach the previous day. Exh. 31.

27. Neither DSO nor HR made any further requests to Dr. Gardner for additional medical information concerning the 2022 Fall Semester accommodation. Exh. 32.

28. Neither Ms. Weidman nor anyone else on KU's behalf ever responded to Dr. Gardner's 3/22/22 request for the 2022 Fall Semester accommodation. Exh 72 at 37, 49; Exh. 74 at 79.

29. At no time after Ms. Weidman sent the February 22, 2022 email to Dr. Gardner "in the interest of future planning" did Ms. Weidman ever speak to anyone with authority over academic planning to avert a course-conversion barrier to Dr. Gardner's request for a synchronous remote work accommodation for the 2022 Fall Semester. Exh. 70 at 95; Exh. 71 at 213; Exh. 72 at 54; Exh. 74 at 58-59.

30. Since Ms. Weidman never responded to Dr. Gardner's request for a remote accommodation in the Fall 2022 Semester, the only option Dr. Gardner had to remain in full-paid status was to exhaust her remaining 34 days of accrued paid leave which expired on October 18, 2022. Exh. 44; Vol. VII at 213-215.

31. In an email dated December 16, 2022, DSO informed Dr. Gardner that her medical documentation did not respond to the information that had been requested on April 15, 2022, including the onset date for her vision impairment, name and onset date for her medication and a description of the level of immunosuppression and its effect on her daily life activities. Exh. 47 at 3-4.

32. On April 25, 2022, Dr. Gardner had provided Ms. Hollenbach with her FMLA documentation which contained the onset date of her vision condition and her immunosuppressing treatment. Exh. 29; Exh 31; Exh. 78 at 55, 57-61.

33. The parties have stipulated that for the 2023 Fall Semester, Dr. Gardner is seeking a remote work accommodation and that KU is not willing to offer it.

## DEFENDANTS' SUPPLEMENTAL UNDISPUTED FACTS

The Court also makes the following additional factual findings from Defendants' Statement of Additional Undisputed Facts (ECF 62):

1. Dr. Hawkinson testified that KU's business model is for students to take "the vast majority of their classes online."  Hawkinson Dep. (Exh. P-70) at 47:4-15, 50:14-21, 54:4-13.

2. Under the terms of the CBA, as of the Fall 2021 Semester, faculty members receive an additional $15 per student who attends the faculty member's class via remote means. Exh. D-11 (CBA pp. 128-29).

3. Dr. Hawkinson testified that his plan for reopening campus for the 2021 Fall Semester adopted recommendations from the Pennsylvania Department of Health, the CDC, and the Pennsylvania Department of Education to enable the campus to reopen its campus with modifications.

4. Dr. Hawkinson testified that during the 2020-2021 school year, KU granted requests from over 200 hundred faculty members to teach remotely. Hawkinson Dep. (Exh. P-70) at 39:16-23.

5.  As a result, approximately 85% of classes during the 2020-2021 school year were conducted fully online. Hawkinson Dep. (Exh. P-70) at 38:4-6.

6. During the 2020-2021 school year, 2,000 students withdrew from KU housing. Hawkinson Dep. (Exh. P-70) at 38:4-6, 39:16-23.

7. Dr. Hawkinson testified that from 2015 up to the onset of the pandemic in March, 2020, approximately five to six percent of its curriculum was offered online. Hawkinson Dep. (Exh. P-70) at 45:6-24.

8. Dr. Hawkinson testified that KU has never hired a full-time faculty member to teach exclusively online. Hawkinson Dep. (Exh. P-70) at 26:15-24.

9. Dr. Hawkinson testified that aside from 2020, KU does not "have any faculty who teach 100 percent online and are not present on campus."  Hawkinson Dep. (Exh. P-70) at 85:5-7.

10. The CBA, under Article 4 "Duties and Responsibilities of Faculty Members," states that faculty members' duties and responsibilities include keeping office hours. Exh. D-11, p. 2.

11. Dr. Hawkinson testified that he strongly believes that faculty presence and participation on campus—both in and out of the classroom—are critical to its pedagogical model of fostering robust engagement between and among students and faculty. Hawkinson Dep. (Exh. P-70) at 56:24-57:14; 112:22-115:4.

12. KU's Business Administration Department does not offer any online-only degrees.

13. Prior to the COVID-19 pandemic, Plaintiff taught her classes predominately in-person; she usually taught no more than one class online per semester. Carroll Dep. (Exh. P-79) at 16:20- 17:21, 28:22-29:13.

14. Every class taught by Plaintiff online was also taught by her in-person at another time in the school year; none was ever offered by the school as a solely online class.

15. Dean Carroll testified that there were multiple issues with respect to Dr. Gardner's basically online or remote work performance. Carroll Dep. (Exh. P-79) at 92:21-25.

16. As of 2019, Dr. Gardner has been on "interim review" status due to her lack of scholarly activity. Pl. Dep. (Exh. P-69) at 182:21-184:7.

17. KU's reopening plan for the Fall 2021 Semester largely continued KU's COVID-19 mitigation measures set in place the prior school year, which included, *inter alia*, HVAC systems modified based on CDC recommendations; Plexiglass

available for classrooms; and personal protective equipment, including KN95 masks, made available for students and employees. Exh. P-36.

18. In August, 2020, Plaintiff's husband moved from Pennsylvania to Greensboro, North Carolina in order to start a new job at a nearby community college. Pl. Dep. (Exh. P-69) at 51:11-16, 76:12-77:6. On November 30, 2020, Plaintiff joined her husband in Greensboro where they lived in a rented condominium. *Id*.

19. Plaintiff testified that she moved to North Carolina once she learned that the 2021 Spring Semester at the University was going to be on synchronous Zoom. Pl. Dep. (Exh. P.-69) at 133. She testified that she planned to return to the University in August of 2021. *Id*.

20. Plaintiff continues to live in North Carolina and has not maintained a residence in Pennsylvania since she moved there in 2020. Pl. Dep. (Exh. P-69) at 77:22-78:3. 28. Dr. Gardner has been taking Humira, an immunosuppressing medication, since June 2021. Shah Dep. (Exh. P-82) at 17:4-17, 18:12-20:16

21. On August 20, 2021, Dr. Shah wrote a letter at Plaintiff's request stating that "due to the new, and more contagious, variant of COVID 19, the Delta variant," he recommended "she begin/continue to work remotely for teaching, office hours, and meetings." Exh. P-55 (CG-1).

22. On January 6, 2022, Dr. Shah wrote a letter at Plaintiff's request stating that "due to the new, and more contagious, variant COVID 19, Omicron Delta variant," he recommended "she begin/continue to work remotely for teaching, office hours, and meetings." Exh. P-56 (DEF-CG00018).

23. On December 8, 2022, Dr. Shah wrote a letter at Plaintiff's request stating that "due to the new, and more contagious, variant COVID 19, Omicron. Delta Variant," he recommended "she begin/continue to work remotely for teaching, office hours, and meetings." Exh. P-57.

24. On May 11, 2023, the federal government lifted the COVID Public Health Emergency. Exh. D-4: CDC end of COVID emergency declaration (May 5, 2023).

25. However, Dr. Shah continues to maintain that it is not safe for Plaintiff to teach in person, even in the special classroom offered by KU.

26. Dr. Shah testified that he would be comfortable with Dr. Gardner teaching in person "[i]f things could get similar to polio . . . where people actually took the polio vaccine, and if we just were never seeing polio mew diagnoses. . . that is a level of low risk. And I think if society got to that level where we didn't see it being transmitted or seeing spikes. . .or ever seeing different variations that could bring about horrible medical issues, I would feel comfortable." Shah Dep. (Exh. P-82) at 56:9-16.

27. Before writing any of his letters, Dr. Shah, who lives and practices medicine in North Carolina, did not consider infection or vaccination rates in Berks County, PA, where KU is located. Shah Dep. (Exh. P-82) at 36:2-13, 51:21-52:4, 75:15-22. Dr. Shah testified that such information was "irrelevant" given the diverse nature of a college campus. P-82 at 36; 51-52, 75-76; 81-82.

28. Ms. Weidman testified that on August 19, 2021, two days before Plaintiff contacted the DSO with her formal accommodation request (on August 21, 2021), Plaintiff called her with questions about being able to teach the 2021 Fall

Semester online instead of in person and being able to use leave for that semester. Weidman Dep. (Exh. P-74) at 6:21-8:6, 12:11- 13:14.

29. Ms. Weidman testified that she did not personally communicate with Dr. Gardner after Dr. Gardner submitted the formal request for accommodation to the DSO and before it was denied on August 25, 2021. Weidman Dep. (Exh. P-74) at 16:21-17:3.

30. Ms. Weidman testified that at some point in August 2021, she spoke with Dean Carroll about the accommodation Plaintiff had requested, either generally or specific to Plaintiff. Weidman Dep. (Exh. P-74) at 19:25-20:23.

31. On January 14, 2022, Plaintiff rejected the proposed alternative accommodation of the plexi-glass shield and face shield for the Spring 2022 semester stating on the form that "[t]his is not a reasonable accommodation. My request for a synchronous teaching assignment is reasonable, feasible, and would impose no significant difficulty, expense, or hardship on the University." Exh. P-7 pp. 1-5.

32. On January 14, 2022, Plaintiff's attorney sent counsel for KU a four-page letter announcing her representation of Plaintiff, calling the alternative accommodation inadequate, demanding that Plaintiff's initial request of 100% remote teaching must be granted by law and that failure to do so would result in a lawsuit. Exh. D-7.

33. In an email dated January 19, 2022, Ms. Weidman offered Dr. Gardner the additional alternative of teaching in a larger classroom so that she could be spaced further away from her students. Exh. P-8.

34. In a responsive email dated January 20, 2022, Dr. Gardner noted that she is represented by counsel and that any correspondence "about this ADA matter" should go through her counsel or PASSHE legal. Exh. D-6.

35. On March 31, 2022, Plaintiff herself emailed Ms. Weidman and Ms. Hollenbach attaching her request for a remote accommodation for the Fall 2022 Semester. Exh. P-29.

36. On April 15, 2022, Ms. Hollenbach sent an email to Plaintiff requesting additional medical documentation in order to "properly evaluate" Plaintiff's request for a remote accommodation. Exh. P-30.

37. Ms. Hollenbach's email did not specify whether this information was needed for purposes of determining whether Plaintiff was disabled or to assist in Plaintiff's most recent accommodation request. Exh. P-30.

38. On April 26, 2022, Plaintiff's attorney sent an email to KU's counsel, complaining about Ms. Hollenbach's April 15, 2022 e-mail to Plaintiff, which she characterized as "alarming" and "concerning" and instructing that any further inquiries regarding Plaintiff's disability status be directed to Attorney McKinley. Exh. D-8.

39. Other than obtaining defense counsel's consent for an August 4, 2022 mediation before Magistrate Lloret, neither Plaintiff nor her counsel made any further communications with the University regarding Plaintiff's Fall 2022 Semester accommodation request.

40. On December 20, 2022, Ms. Weidman presented Plaintiff with an alternative

accommodation for the Spring 2023 Semester as follows:

> We will convert the computer lab behind Old Main to a
> computer classroom. This room will have one row of desks
> removed to allow for the installation of an ADA-compliant
> presenter podium, which will be enclosed on three sides with
> a plexiglass shield. The class capacity would be capped at
> 35 students. Appropriate audio-visual equipment (screen,
> whiteboard, projector, etc.) will be installed. Two portable air
> scrubbers will be placed in the room to increase ventilation
> and air exchange. This is a standalone room with its own
> exterior entrance and restroom facility. Access to the room
> during the day will be limited to those classes scheduled
> there and disinfecting wipes will be available to wipe down
> areas as desired. This should provide a larger computer-
> equipped space with additional ventilation and air exchange
> and reduced foot traffic.
> In order to have this work completed in time for the start of
> the spring semester, we will need to submit the Facilities and
> IT work orders in a very short timeframe. If you have
> questions about our offer or would like to discuss, please let
> me know. I am in the office the rest of the week. I would ask
> that you let me know if you accept or reject the offered
> accommodation by the close of business on Thursday
> 12/22/22.

Exh. D-9, pp. 5-6.

41. On December 22, 2022, Dr. Gardner responded to Ms. Weidman by asking

ten questions concerning the proposed alternative accommodation.

> I am assuming this offer of an accommodation is an
> acknowledgement by the university of my medical condition
> being treated as disability and there is no need to respond to
> the request by McKenzie Hollenbach for further medical
> information. If I'm wrong, of course, I will treat your offer as
> offered prematurely at this time.
>
> Assuming you have no questions on my disability, your offer
> raises questions for me related to my disability-related health
> and safety concerns. In order to minimize my interactions
> with Dr. Shah (you can understand that a medical school

professor who is also a practicing physician would prefer I have all of the information at one time) would you kindly answer the following question about the proposed accommodation so I can go to him with a completed plan.

1. How would I enter the building safely? Would I go straight from my car to class? If not, how would I navigate the elevators and/or stairwell leading from my office to the classroom building? (The current letter from my doctor requires me to avoid crowds.)

2. If I am using my office for office hours, how would the students be distanced from me there? Would I be able to require masks?

3. Would the students in my classes be required to be current with the Covid vaccines or report their status of same?

4. Would students be tested for Covid at regular intervals? Would they be required to have a negative Covid test on the first day of class?

5. Could the students be required to wear an N-95 mask in the classroom?

6. What are the physical dimensions of the classroom? Would the 35 students be socially distanced?

7. Since this room will remain a computer classroom, it is difficult to imagine how a computer lab would be a conducive environment for my classes. Some labs have had laptops that were stowed in the computer tables when not needed, allowing for students to be sitting at a regular desk/table environment. What would be the computer setup in the lab?

8. You mention the access to the classrooms during the day will be limited to those classes scheduled there. Would those classes be only for those faculty needing this kind of accommodation? Would this lab be open in the evening to any student or faculty?

9. Would access to the restroom facility in the building be limited to those individuals (students and faculty) using the building?

10. Would adding the two air scrubbers put the classroom in compliance with the CDC Guidelines for the air filtration suggested for Institutes of Higher Education?

If you could kindly respond as soon as you possibly can, I will present one completed plan to my doctor.

Exh. D-9, pp. 4-5.

42. On January 3, 2022, Weidman provided a response to each of the ten

questions as follows:

> 1. The classroom in question is on the first floor in a standalone building behind Old Main, with a ground-level exterior entrance. There is a parking area directly behind the building. We recommend you avoid use of the elevator if you want to avoid being in a confined space with others, and there shouldn't be crowds in that stairwell in Old Main.
> 2. You can have the student seated as far away from you in your office as possible or you can schedule your office hours in an alternate location providing you with more space. You can ask someone to wear a mask, but we cannot require anyone to wear a mask.
> 3. Covid vaccines are not required of anyone. Students are not required to disclose their vaccination status. In addition, these safeguards we are offering are to address these concerns.
> 4. Covid testing is not required. The safeguards being offered are to address your safety concerns.
> 5. No, masks of any type may not be required.
> 6. The room holds 48 seats. In order to provide greater social distancing, we are capping the enrollment at 35 students. We would eliminate the first row of seats to install ADA-compliant presenter podium, which will be enclosed on three sides with a plexiglass shield. In addition the first row of seats would be left empty.
> 7. We are installing all the necessary computer and A/V equipment to make the classroom conducive to learning. Whether there is a 2 computer monitor or laptop setup should not interfere with your delivery of the course material to your students.
> 8. During the day, access to the room would be limited to those students and faculty with classes scheduled in that room. The only classes to be scheduled in this room would be for those faculty needing this type of accommodation. The room would remain open to any student or faculty in the evenings. We are providing disinfecting wipes in the classroom for use by anyone who may wish to do so.
> 9. While use of the restroom is not specifically restricted, unless you are using that classroom, you wouldn't know there was a restroom there.
> 10. The CDC guidelines provided recommendations/suggestions, not requirements. Two air scrubbers will address the ventilation and air exchange in the classroom.

Exh. D-9, pp. 2-3.

43. On January 5, 2023, Dr. Gardner responded with three additional questions

as follows:

> Regarding number 6—thank you for the room capacity. I was asking for the physical dimensions of the room so I could calculate the square footage. If you have the square footage that would be fine. Otherwise, the dimensions of the room would be helpful.
> Regarding number 7, would you happen have the actual room computer configuration. Could we get it from IT? There is quite a difference in the how the space would work for my type of courses regarding the computer monitors, etc. My students engage in group activities. There is considerable academic literature in this area known as the sociimateriality of learning spaces that address the learning environment.
> Regarding number 10, would you provide more information on the air scrubbers.
>
> I have reached out to my doctor.

Exh. D-9, p. 2.

44.  On January 13, 2023, Ms. Weidman responded to these follow

up questions and asked Dr. Gardner to inform her by January 16,

2023 if the proposed classroom was acceptable:

> The room is 11,212.72 cubic feet (1401.59 s.f. x 8' high ceiling). The current computers in the room are all-in-one units on the desktops but students seated will be able to see each other and the speaker at the front of the room. The Carrier Air Scrubbers have HEPA filters and MERV 13 filters. The goal is to have a minimum of 6 air changes per hour. One air scrubber in that room can't meet the demand, so we would place two units. We also have a bi-polar ionization unit on the heat pump supplying this space and increased MERV filtration. No manufacturer will certify that with the use of their equipment the air in the space is COVID free. All that can be done is add layers of protection to minimize the odds of catching COVID in any particular space. Please let me know if you have any other questions. Based upon the information above, please advise if you would like to accept these reasonable accommodations and return to teaching as described above, or if you wish to continue with an FMLA leave for the spring semester. Please respond by end of business on 1/16/23. As you are aware, classes are beginning in less than two weeks. This will allow the department to plan accordingly.

Exh. D-9, pp. 1-2.

45. In an email dated January 16, 2023, Dr. Gardner responded as follows:

> Thank you for the information. As you know, the current TRO litigation is not yet resolved, and KU is not open for business on Monday, January 16th in observation of Martin Luther King Day. As you are aware that Judge Schmehl has asked me to provide a supplemental letter from my doctor by January 18, 2023 regarding your recent proposal. I am making my best efforts to do that. My attorneys will be addressing these issues with the doctor's office, the Court, and the OAG next week.

Exh. D-9, p.1.

46. In an email dated January 19, 2023, Dr. Gardner formally rejected the proposed accommodation based on the recommendation of Dr. Shah and requested, as an alternative accommodation, an extension of her Leave Without Pay status.  Exh. 31, p.3.

47. Plaintiff did not propose any additional measures for the University to take to make the proposed large classroom acceptable for her to teach in person.

## **DISCUSSION**

The Court will begin its analysis with the main claim in this case---Plaintiff's claims in Counts Three and Four for direct disability discrimination under the RA based on direct evidence and disability discrimination based on pretext. As the Court did in the *Oross* case, the Court will only address the disability discrimination claim based on pretext so that it can make a complete and thorough analysis of the discrimination issues in this case.

The familiar framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 793–94, (1973), for discrimination claims under Title VII is equally applicable to discrimination claims under the RA. *Wishkin v. Potter*, 476 F. 3d 180, 185 (3d Cir.

2007). Under the *McDonnell Douglas* burden shifting paradigm, plaintiff has the initial burden to make a *prima facie* showing of discrimination, but if she does so, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employment action. *McDonnell Douglas,* 411 U.S. at 802. If the defendant meets this burden, the presumption of discriminatory action raised by the prima facie case is rebutted. *Tex. Dep't. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254–55 (1981). However, the plaintiff must then be afforded an opportunity to show that the employer's stated reason for the employment action, such as plaintiff's termination, was pretextual. *McDonnell Douglas,* 411 U.S. at 804.  In order to prove the employer's explanation is pretextual, the plaintiff must "cast [ ] sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication ... or ... allow[ ] the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes v. Perskie,* 32 F.3d 759, 762 (3d Cir.1994). A plaintiff who has made out a *prima facie* case may defeat a motion for summary judgment by either "(i) discrediting the employer's proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Id.* at 764.

To establish a *prima facie* case of discrimination under Section 504 of the RA, a plaintiff must initially show, "(1) that he or she has a disability; (2) that he or she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) that he or she was nonetheless

terminated or otherwise prevented from performing the job." *Donahue v. Conrail*, 224 F. 3d 226, 229 (3d Cir. 2000) (citation omitted). "If the plaintiff is able to meet these burdens, the defendant then bears the burden of proving, as an affirmative defense, that the accommodations requested by the plaintiff are unreasonable, or would cause an undue hardship on the employer." *Id.* An undue hardship involves "significant difficulty or expense in, or resulting from, the provision of the accommodation." 29 C.F.R. § 1630, App. § 1630.2(p).

The parties have stipulated that "[f]or purposes of summary judgment, Defendants do not dispute that Dr. Gardner has a disability as defined by Section 504." JSUF at 14. Indeed, the issue of Plaintiff's medical condition being a disability "has never been an issue" for KU. Exh. 49 at 3; Exh. 72 at 60; Exh. 74 at 95.

The parties have further stipulated that Dr. Shah diagnosed Plaintiff in December, 2020 as suffering from "peripheral focal chorioretinal inflammation and panuveitis of both eyes, an auto-immune condition for which there is no cure." JSUF 16. They also stipulated that Dr. Shah had explained to Dr. Gardner that the disease was "potentially vision-threatening and potentially blinding." JSUF 17. Because of the suppression of her immune system, Dr. Gardner was at high risk for severe illness or death if she contracted COVID-19 in the Fall of 2021. Exh. 58; Exh. 82 at 28. The Court finds there is no dispute in the record that Plaintiff was disabled from the time her first request for a remote work accommodation was denied on August 26, 2021 through June 11, 2023, the date she filed her motion for partial summary judgment.

For a plaintiff to be "qualified" under the RA, she "must 'satisf[y] the prerequisites for the position, such as possessing the appropriate educational background,

employment experience, skills, licenses, etc.' and, she must be able to 'perform the essential functions of the position held or desired, with or without reasonable accommodations.'" *Taylor v. Phoenixville School Dist.*, 184 F. 3d 296, 311 (3d Cir.1999). "The determination of whether an individual with a disability is qualified is made at the time of the employment decision, and the burden is on the employee to prove that he is an 'otherwise qualified' individual." *Kieffer v. CPR Restoration & Cleaning Serv.*, LLC, 200 F. Supp. 3d 520, 533 (E.D. Pa. 2016), aff'd, 733 Fed. Appx. 632 (3d Cir. 2018) (citing cases).

In this case, the first "employment decision" was made on August 26, 2021, when Ms. Weidman denied Plaintiff's request for a synchronous remote work accommodation for the Fall 2021 Semester. JSUF 54. There is no dispute that Plaintiff has the appropriate educational background and employment experience to perform the job of Associate Professor of Business Administration at KU. In fact, she has been a tenured professor at KU since 2011. The issue concerns whether Plaintiff can perform the "essential functions" of that position, with or without reasonable accommodation.

The Defendants argue that an essential element of Plaintiff's job as Associate Professor of Business Administration is to teach and conduct office hours in-person. Plaintiff responds that teaching and conducting office hours in-person is not an essential function of her job as both she and other faculty members have synchronously and successfully taught some of their classes remotely in the past and the University even has a framework in place for doing so.

It is well-established that "[w]hether a particular function is essential is a factual determination that must be made on a case-by-case basis [based upon] all relevant

evidence." *Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 612 (3d Cir. 2006) (quoting *Deane v. Pocono Medical Ctr*., 142 F.3d 138, 148 (3d Cir. 1998)); *see also Skerski v. Time Warner Cable Co*., 257 F.3d 273, 279 (3d Cir. 2001) (same). In addition to stating that the essential function determination is a factual question, our Court of Appeals has recommended that it should typically be left for the jury to decide. *See Deane, 142 F.3d at 148* (refusing to grant summary judgment on the basis that the question of whether lifting heavy objects was an essential function of a nurse was a fact question for the jury); *see also Skerski, 257 F.3d at 280* (reversing district court's holding that climbing was an essential function of installer technician and cautioning against snap judgments regarding essential functions); *Turner, 440 F.3d at 613* ("[T]he fact issue as to `essential function' must be decided by a jury.").

Whether a job duty is an "essential function" turns on whether it is "fundamental" to the employment position. 29 C.F.R. § 1630.2(n)(1); *Turner,* 440 F.3d at 612 (quoting 29 C.F.R. § 1630.2(n)(1)). The term "essential function" does not include the "marginal" functions of the position. *Id*. As stated by the Court of Appeals in *Skerski*:

> The regulations further set forth a non-exhaustive list of seven examples of evidence that are designed to assist a court in identifying the `essential functions' of a job. They include: (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; (5) the terms of a collective bargaining agreement; (6) the work experience of past incumbents in the jobs; and/or (7) the current work experience of incumbents in similar jobs.

*Skerski,* 257 F.3d at 279 (citing 29 C.F.R. § 1630.2(n)(3)).

Although the determination of whether a job duty is an "essential function" normally is a question for the jury, the Court finds that in this case there are no factual issues for a jury to resolve and the Court can make the determination as a matter of law.

Under the CBA, the evaluation of faculty members at the University consists of three categories: effective teaching, scholarship and service to the University. CBA Article 4 and Article 12. (ECF 52-1 at pp. 13-16); Exh. 79 at 17-18.

Defendants do not cite to any provision in the CBA or in any University job or course description which states that teaching in-person in the classroom and conducting office hours in-person are essential functions of the position of Associate Professor in general and of Plaintiff's position in particular. JSUF 38, 84. On the contrary, according to KU's own published marketing materials, distance education is a "critical component to the University's mission to lead itself into the future." JSUF 10. The University admits that it has a dedicated team of instructional designers, media producers, and technical support staff that collaborates with faculty "to ensure that the online experience reflects the rigorous education for which [it] is known." JSUF 11. Under the University's Course Design Principles and Models, synchronous online instruction takes place 100% remotely using Zoom or other video conferencing software, which allows for virtual interaction between instructors, students and colleagues in real time. JSUF 29. Indeed, "[n]ew technology had been recently installed across campus which 'allows [] for synchronous instruction for Fall 2020 and beyond.'" JSUF 64.

While the Court recognizes that prior to the COVID-19 pandemic, KU had never had a faculty member who taught 100% of his of her classes online or remotely, KU had

in fact offered a limited number, approximately five-six percent of its course offerings, as online classes from 2015 until the beginning of the pandemic in 2020. See Hawkinson Dep. at 45. During the Spring 2020 Semester, KU temporarily delivered courses in an online format and faculty held office hours online and conducted faculty and committee meetings remotely. JSUF 19. The parties have further stipulated that in the Fall Semester of 2021, which is the initial period involved in this litigation, 13% of the University's course offerings were fully online, while another 10% were delivered at least partially online. JSUF 65.

With respect to Professor Gardner in particular, for the 2021 Fall Semester, she was scheduled to teach three of her classes in person and one class online. JSUF 66. In fact, "[p]rior to the 2021 Fall Semester, Dr. Gardner had taught Human Resources Management (MGM 335) in a remote modality 3 times." JSUF 67. She had also taught "Business and Social Environment" 16 times online, and also converted two sections from in-person to online when the Covid-19 shutdown occurred in March, 2020." JSUF 69. Between the Fall 2006 Semester and the conclusion of the 2020 Fall Semester, Dr. Gardner who had received her certificate in advanced online teaching from KU in 2013, had taught 38 classes online. JSUF at 12-13. She had also taught three classes and supervised Independent Study and an internship online in the 2020 Spring Semester after the shut-down occurred. JSUF 20 and 21. For the Fall 2020 Semester, Dr. Gardner was granted a flexible work arrangement where she taught all of her courses synchronously online. JSUF 28. Dr. Gardner continued to teach her full course load online for the first half of the Spring 2021 Semester. JSUF 30. All of these statistics

belie the University's claim that teaching in- person is an essential function of Plaintiff's job as Associate Professor of Business Administration.

Other than citing Dr. Hawkinson's testimony that he personally believed that in-person instruction is more effective than remote instruction, the Defendants did not submit any empirical data that would indicate that there was any diminution in the quality of a class as the result of the course being offered online in general or as the result of any of Professor Gardner's classes being offered online in particular.  In fact, neither Dean Carroll nor Dr. Chao objected to Plaintiff's request for a remote work accommodation for the Fall 2021 Semester.

Since the Court finds from the undisputed record that teaching in-person and conducting office hours in-person are clearly not essential functions of the job of Associate Professor of Business Administration at the University and that Professor Gardner can fully perform the essential functions of her job by teaching remotely (as she had done in the past), Professor Gardner has demonstrated that she was "qualified" for purposes of a *prima facie* case under Section 504 of the RA.

Third, Plaintiff must establish that "'[s]he has suffered an otherwise adverse employment decision as a result of discrimination.'" *Shaner v. Synthes,* 204 F.3d 494, 500 (3d Cir. 2000).  "An adverse employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761 (1998).

Professor Gardner has satisfied the third element of a *prima facie* case of discrimination by demonstrating that the Defendants' repeated denial of her request for

an accommodation of remote teaching and office hours forced her to exhaust all of her accrued paid leave in order to remain on full-time paid status for the Fall Semester of 2021 and thereafter. PSUF 14, 16, 30. In the absence of court intervention, Plaintiff also would have been forced to give up her medical benefits as of December 29, 2021 while retaining only limited return to work rights.

Having found that Plaintiff has established all three elements for a *prima facie* case of disability discrimination under the RA, the Court now addresses whether the Defendants have demonstrated that Plaintiff's request for a synchronous remote work accommodation was unreasonable or would have caused an undue burden on the University.

The parties have stipulated that allowing Dr. Gardner to teach her four 2021 Fall Semester classes online would not have "entailed significant expense to the University, and was not infeasible technology-wise." JSUF 63, 85. Defendants have not produced any evidence of any undue burden[6] in terms of expense or difficulty that the University would incur if the modality of Professor Gardner's classes was changed from in-person teaching to remote teaching. On the contrary, the record reveals that the University had a framework for remote teaching already in place and that existing technology at the University would have allowed Professor Gardner and her students to see and interact with each other in real time without requiring any significant difficulty or expense to the University. JSUF 63, 64. Indeed, Professor Gardner had just taught her classes in the Fall of 2000 and the Spring of 2021 using the University's remote format. And to the

---

[6] Although Defendants concede that they did not plead undue burden as an affirmative defense in their Answer to the Complaint, they claim Plaintiff "has been on notice of the defense for at least the last twelve months. See Doc. 21 (filed 8/21/22), at Brief pp. 4-6 & 16 [Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for a Temporary Restraining Order]"  ECF 63 at p. 7.

extent the Defendants claim that the undue burden is to the students who signed-up for Plaintiff's Fall 2021 Semester classes on the assumption that such classes would to be in-person, student preferences simply do not qualify as an undue burden under the RA and, in any event, must yield to the requirements of Section 504 of the RA. There is simply no evidence in the record from which a reasonable jury could conclude that Dr. Gardner's requested accommodation was unreasonable or would have caused an undue burden on the University.

Having found that Plaintiff has established a *prima facie* case of disability discrimination under Section 504 of the RA and that the Defendants have not produced any evidence of an undue burden, the Court next considers whether the University has met its burden to articulate a facially "legitimate non-discriminatory" reason for the denial of Plaintiff's request for an accommodation. This "relatively light" burden is met "if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013). Notably, a defendant "need not prove that the articulated reason actually motivated its conduct" at this stage. *Id*. Rather, "[t]he proffered reason need only raise a genuine issue of fact as to whether the employer acted impermissibly." *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003).

Here, the Court finds that, solely for this phase of the *McDonnell-Douglas* paradigm, the University has articulated a legitimate, non-discriminatory reason for not permitting Plaintiff to teach her four classes remotely and not conduct her office hours remotely, namely that converting classes and office hours from an in-person modality to

a remote modality would be a fundamental alteration of the University's course offerings to students.

As a result, the burden now shifts back to Professor Gardner to show that the University's legitimate non-discriminatory reason was a pretext or fabrication and that discrimination was more likely than not a motivating or determinative cause of the decision not to grant Plaintiff's request for an accommodation.

The parties have stipulated that during a meeting in late July or early August of 2021, Mr. Pena and Ms. Weidman "concluded that converting in-person classes to online was not a reasonable accommodation for the University." JSUF 39. Ms. Martin used the template Ms. Weidman and Mr. Pena instructed her to use on all faculty requests seeking remote work accommodations for courses that were previously scheduled to be held in-person. JSUF 60. The parties have further stipulated that Ms. Martin used the same basic template to prepare denials for all the remote work accommodations for the fall semester [of 2021]. JSUF 61.

Yet, the University's ADA Employee Policy, DIV-200, "requires that all accommodation requests be evaluated on an individual basis to determine whether the provision of such accommodation would create an undue hardship to KU." JSUF 46. The ADA Employee Policy also provides that "if the employee has a qualifying disability and with or without reasonable accommodations, can perform the essential functions of a position, a reasonable accommodation, if available, and not creating an undue burden to KU, should be provided." JSUF 47.

However, there is no evidence in the record that any of the Defendants (or anyone else at the University) ever considered Plaintiff's particular and serious

individual circumstances before denying her request to teach and conduct office hours remotely for the Fall Semester of 2021 or anytime thereafter.

For instance, there apparently was no consideration given to the fact that at the time Professor Gardner made her first formal request for a remote accommodation on August 11, 2021, she had been diagnosed by Dr. Shah as suffering from "peripheral focal chorioretinal inflammation and panuveitis of both eyes, an auto-immune condition for which there is no cure." JSUF 16. Nor is there any evidence that any consideration was given to Dr. Shah's opinion that this disease was "potentially vision-threatening and potentially blinding," JSUF 17, or that because of the suppression of her immune system, Dr. Gardner was at high risk for severe illness or death if she contracted COVID-19 in the Fall of 2021. Exh. 58; Exh. 82 at 28. Indeed, even the CDC's July 21, 2021 "Guidance for Institutions of Higher Education (IHE)" recommended "options for accommodations, modifications, and assistance to students, faculty, and staff at increased risk for severe illness that limit their exposure to risk and allow for education and or work opportunities (such as virtual learning, telework, and modified job responsibilities, including work-related meetings and gatherings)." JSUF 74. Dr. Hawkinson and Ms. Weidman both testified that each was aware of the CDC's July 2021 Guidance. Exh. 71 at 81; Exh. 75 at 66.

Instead, the record reveals that Mr. Pena, Ms. Weidman and Ms. Martin simply denied Professor Gardner's request for an accommodation based on their recently devised mantra that **any** accommodation request that would change the modality for a scheduled class would fundamentally alter the course and therefore place an undue burden on the University. Clearly, allowing Professor Gardner to teach only four courses

and conduct her office hours online during the Fall 2021 Semester when the University offered the vast majority of its classes in-person, would not have fundamentally altered the University's pedagogical model.

Based on the uncontroverted record in this case, the Court finds, as a matter of law, that the Plaintiff has directly discredited the Defendants' proffered reason for denying her request for a reasonable accommodation and that their actions were pretextual. It certainly seemed like the University was bent on returning to in-person instruction in the 2021 Fall Semester no matter what the circumstances or effect were on any faculty member. Accordingly, judgment will be entered in favor of Plaintiff and against the University on her claims for intentional discrimination (Counts Three and Four).

The Court now turns to Plaintiff's claim of discrimination based on a failure to accommodate. "[A]n employer discriminates against a qualified individual with a disability when the employer does 'not make reasonable accommodations to the known physical or mental limitations of the individual unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the [employer].' " *Taylor,* 184 F.3d at 306 (quoting 42 U.S.C. § 12112(b)(5)(A)). To determine the appropriate reasonable accommodation, the employer should initiate the interactive process. *See* 29 C.F.R. § 1630.2(*o* )(3). "Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." 29 C.F.R. pt. 1630,

app. § 1630.9. Both parties bear responsibility for participating in this

process. *Taylor,* 184 F.3d at 312.

Although "an employer has a duty to offer a reasonable accommodation to a

qualified employee, 'an employee cannot make [the] employer provide a specific

accommodation if another reasonable accommodation is instead provided.'" *Solomon v.*

*Sch. Dist. of Philadelphia*, 532 F. App'x 154, 158 (3d Cir. 2013) (non-precedential)

(quoting *Hankins v. The Gap, Inc*., 84 F.3d 797, 800-01 (6th Cir. 1996)); see

also *Yovtcheva v. City of Philadelphia Water Dep't*, 518 F. App'x 116, 122 (3d Cir.

2013) (non-precedential) ("[A]n employer is not obligated to provide an employee the

accommodation he requests or prefers, the employer need only provide some

reasonable accommodation." (quoting *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th

Cir. 1996))); *Hofacker v. Wells Fargo Bank Nat'l Ass'n*, 179 F. Supp. 3d 463, 469 (E.D.

Pa. 2016) ("[A]n employer has no requirement to provide an employee the exact

accommodation that they want; rather, all the interactive process requires is that

employers make a good-faith effort to seek accommodations." (internal quotation marks

and alterations omitted)).

In order for an employer to be found liable for discrimination on the basis of

failure to accommodate, the Plaintiff must produce evidence that: "'(1) he was disabled

and his employer knew it; (2) he requested an accommodation or assistance; (3) his

employer did not make a good faith effort to assist; and (4) he could have been

reasonably accommodated.'" *Capps v. Mondelez Global, LLC*, 847 F.3d 144, 157 (3d

Cir. 2017) (quoting *Armstrong v. Burdette Mem'l Hosp.*, 438 F.3d 240, 246 (3d Cir.

2006)) (additional citations omitted). "A reasonable accommodation is one that enable[s]

an individual with a disability who is qualified to perform the essential functions of that position … [or] to enjoy equal benefits and privileges of employment." 29 C.F.R. § 1630.2(o)(1)(ii)-(iii).

"Employers can show their good faith in a number of ways, such as taking steps like the following: meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered [the] employee's request, and offer and discuss available alternatives when the request is too burdensome." *Taylor*, 184 F. 3d at 317 (3d Cir.1999).

With regard to the first element, the University does not dispute that Professor Gardner was disabled and that it was aware of her disability. There is also no dispute that Professor Gardner requested an accommodation of teaching her classes and conducting office hours remotely on August 20, 2021. Just six days later, Ms. Weidman denied the request. The parties have stipulated that "[a]ccording to KU's Human Resources website, the HR Director [Ms. Weidman] will work closely with the employee's supervisor, manager, chair and/or Dean to gather the relevant information necessary to respond to the request and assess whether a particular accommodation will be effective, and "may convene a meeting to continue the interactive process to discuss the requested accommodation as well as alternative accommodations that may be effective in meeting the requester's needs." JSUF 52. The parties have stipulated that before Dr. Gardner's request was denied, neither Ms. Martin nor Ms. Weidman had even spoken to Dr. Gardner about her request for accommodation. JSUF 55, 56. Nor had anyone at the University requested any input from the Dean Carroll or from Dr.

Chao. JSUF 57, 58. Instead, the parties have stipulated that in officially denying Dr.

Gardner's requests for a remote work accommodation, Ms. Martin used the template

Ms. Weidman and Mr. Peña instructed her to use to deny all faculty requests seeking

remote work accommodations for courses that were previously scheduled to be held in

person. JSUF 60, 61. Based on the previous discussion concerning pretext, *supra*, and

the undisputed record in this case, the Court finds, as a matter of law, that the

University did not make any effort, let alone a good faith effort, to accommodate Plaintiff

during the Fall 2021 Semester and that Professor Gardner could have easily been

accommodated without causing an undue burden on the University. Therefore,

judgment will be entered in favor of Plaintiff and against the University on her claim in

Count One for discrimination based on a failure to accommodate for the Fall 2021

Semester.

On January 5, 2022, Plaintiff again requested an accommodation for a

synchronous remote teaching schedule, this time for the Spring 2022 Semester. In

response, Ms. Hollenbach held a meeting with Dr. Gardner on January 10, 2022 during

which Dr. Gardner stated that she needed a remote assignment because her

immunosuppressing medication "place her at higher risk for contracting the new variant

of Covid-19." JSUF 79. Neither Ms. Weidman nor anyone else from HR attended this

meeting. JSUF 80. Just two days later, on January 12, 2022, Ms. Weidman denied the

request, once again stating that converting Dr. Gardner's three in-person classes to an

online modality is a "fundamental alteration of the course delivery" JSUF 82. The form

also stated that an essential function of the job of Associate Professor is "in-person

teaching." JSUF 84.

Before denying Dr. Gardner's request, Ms. Weidman did not meet with Dr. Gardner. Nor was Dean Carroll nor Dr. Chao involved in the determination of Dr. Gardner's request. JSUF 82, 94, 95. On the same date she denied Plaintiff's request, Ms. Weidman did for the first time offer Dr. Gardner an alternative accommodation of teaching in-person behind a plexiglass shield and wearing a face mask. This alternative accommodation was not discussed during Dr. Gardner's January 10, 2022 meeting with Ms. Hollenbach. Exh. 5 at 4; Exh. 74 at 40.

On January 14, 2022, Dr. Gardner rejected the alternative proposal as "not a reasonable accommodation." JSUF 98. The parties have stipulated that at the time Dr. Gardner rejected the alternate accommodation, "[c]ovid cases were on the rise, but testing and vaccination and testing were still optional and classrooms had returned to pre-pandemic configurations, leaving no room for social distancing. Outside the classroom, social distancing was still not mandatory, and the modifications CDC had recommended to make HVAC systems safer for students and staff still had not been made." JSUF 99. In addition, the plexiglass shield that Ms. Weidman offered to Dr. Gardner was not based on Dr. Gardner's specific condition but was generally offered to all faculty who wanted to convert in-person classes to a virtual modality. Exh. 14 at 4; Exh. 76 at 32-33; Exh. 74 at 40. In an email dated January 19, 2022, Ms. Weidman offered Dr. Gardner the additional alternative of teaching in a larger classroom so that she could be spaced further away from her students. Exh. P-8. In a responsive email dated January 20, 2022, Dr. Gardner noted that she is represented by counsel and that any correspondence "about this ADA matter" should go through her counsel or PASSHE legal. In addition, the alternative of teaching in a larger classroom was not

offered until January 19, 2022, exactly one week after Plaintiff's request for a reasonable accommodation had already been denied.

Based on the previous discussion concerning pretext, *supra*, and the undisputed record in this case, the Court finds, as a matter of law, that the University did not make a good faith effort to accommodate Plaintiff during the Spring 2022 Semester and that Professor Gardner could have easily been accommodated without causing an undue burden on the University. Therefore, judgment will be entered in favor of Plaintiff and against the University on her claim for discrimination in Count One based on a failure to accommodate for the Spring 2022 Semester.

On March 31, 2022, Dr. Gardner submitted a request for a remote accommodation for the Fall 2022 Semester. The record reveals that, other than a request by Ms. Hollenbach to Plaintiff on April 15, 2022 for more medical documentation from Plaintiff concerning her accommodation request, the University did not engage in an interactive process with Plaintiff for the Fall 2022 Semester. In fact, neither Ms. Weidman nor anyone else on KU's behalf ever responded to Dr. Gardner's request for the 2022 Fall Semester accommodation. Exh 72 at 37, 49; Exh. 74 at 79. Therefore, judgment will be entered in favor of Plaintiff and against the University on her claim for discrimination in Count One based on a failure to accommodate for the Fall 2022 Semester.

Finally, on December 2, 2023, Dr. Gardner submitted to Ms. Hollenbach a request for remote work accommodation for the 2023 Spring Semester. Exh. 45. On December 20, 2022, Ms. Weidman wrote to Dr. Gardner and the plaintiffs in the two related cases offering an alternative accommodation in a classroom to be converted

from a computer lab with a separate entrance, a cap of 35 students, additional ventilation and air exchange, including two portable air scrubbers with both HEPA and MERV filters and bi-polar ionization unit on the heat pump used for the space, reduced foot traffic, and an ADA-compliant instructor podium, enclosed on three sides with a plexiglass shield. The deadline for accepting or rejecting the proposed alternative was the close of business on December 22nd, which was when the University was closing for the holidays until January 3, 2023. Exh. 48; Exh. 74 at 97-98.

Dr. Gardner responded to Ms. Weidman on December 22, 2022 by asking 10 questions about the proposed new classroom that she believed her doctor would need to evaluate the safety of the proposed alternative accommodation. Exh. 48 at 2. On January 3, 2022, Ms. Weidman provided a response to each of the ten questions. On January 5, 2023, Dr. Gardner responded with three additional questions. On January 13, 2023, Ms. Weidman responded to these follow up questions and asked Dr. Gardner to inform her by January 16, 2023 if the proposed classroom was acceptable. In an email dated January 19, 2023, Dr. Gardner formally rejected the proposed accommodation based on the recommendation of her doctor. Plaintiff did not propose any additional measures for the University to take to make the proposed large classroom acceptable for her to teach in person. Based on the University's actions, the Court finds, as a matter of law, that the University engaged in a good faith effort to locate a reasonable alternative for Dr. Gardner for the Spring 2023 Semester. Accordingly, judgment will be entered in favor of the University on this portion of Count Two.

In Count Two, Plaintiff contends that the University's policy of requiring her to return to work with no restrictions amounts to essentially a "100% healed" policy that is a *per se* violation of the RA. Our Court of Appeals has held that "`plaintiffs [cannot] reach a determination of unlawfulness under the ADA by proving only the existence of a 100% healed policy, without any inquiry into whether that policy has been used to discriminate against individuals protected by the ADA from such discrimination.'" *Solomon,* 532 Fed. App'x. at 158, quoting *Hohider v. United Parcel Serv., Inc.,* 574 F.3d 169, 195 (3d Cir.2009).

Here, the Court has already found that Plaintiff is disabled and is qualified to perform the essential functions of her job. The Court has further found that the University has applied what amounts to a blanket no restrictions policy to discriminate against Plaintiff [and Dr. Oross] in denying her request for a reasonable accommodation without considering her individual circumstances. Therefore, Plaintiff is entitled to judgment on Count Two.

In Count Five, Plaintiff asserts a claim for "disparate impact based on prohibited standards, criteria, or methods of administration." Specifically, Plaintiff alleges that the "full-duty policy that [KU] applied to Dr. Gardner constitutes a standard or qualification criterion that has a disparate impact upon qualified employees with disabilities because it screens them out or has a tendency to do so." Complaint at ¶ 150.

The "disparate impact" theory of liability is based on the premise that "some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination." *Watson v. Fort Worth Bank and Trust,* 487 U.S. 977, 987 (1988). To make out a *prima facie* case of typical

disparate impact discrimination under Title VII, a plaintiff must: (1) identify the challenged employment practice or policy and pinpoint the defendant's use of it; (2) demonstrate a disparate impact on a group that falls within the protective ambit of Title VII; and (3) demonstrate a causal relationship between the identified practice and the disparate impact. *See* 42 U.S.C. § 2000e–2(k)(1)(A)(i).To prove the second element, Plaintiff would normally have to produce statistics or some equivalent measure. *Newark Branch, N.A.A.C.P. v. Town of Harrison, N.J.*, F. 2d 792, 798 (3d Cir. 1991).

Unlike Title VII, 42 U.S.C. § 12112(b)(6) prohibits "using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selective criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity."

To establish a *prima facie* disparate impact claim under § 12112(b)(6) of the ADA a plaintiff must (1) identify the challenged employment practice or policy, (2) demonstrate that the practice or policy had an adverse impact on the plaintiff with a disability, and (3) demonstrate a causal relationship between the identified practice and the disparate impact. *See Gonzales v. City of New Braunfels, Tex.*, 176 F.3d 839 n. 26 (5th Cir. 1999). In the ADA/RA context, unlike in the Title VII context, a plaintiff may satisfy the second prong of her *prima facie* case by demonstrating an adverse impact on herself rather than on an entire group. *Id. citing* 1 Barbara Lindemann & Paul Grossman, *Employment Discrimination Law* 333–34 (3d ed.1996); *see also Bryan v. Wal-Mart Stores, Inc.*, 669 Fed.App'x. 908, 909 (9th Cir. 2016); *EEOC v. Dolgencorp, LLC*, 2022 WL 2959569, at *8 (N.D. Ala. July 26, 2022); *Leskovisek by next friend*

*Stanley v. Illinois Department of Transp.*, 506 F. Supp. 3d 553, 569 (C.D. Ill. 2020);

*Williams v. ABM Parking Servs. Inc.*, 296 F. Supp. 3d 779, 789–90 (E.D. Va.

2017) ("[A]n individual advancing an ADA disparate impact claim need not present

statistical evidence if he or she can show that a job qualification screens out the

plaintiff on the basis of his or her disability.")

Here, the undisputed record reveals that Plaintiff identified the challenged policy

as the University's full-time full-duty policy. Plaintiff also clearly demonstrated that the

full-time full-duty policy had an adverse impact on herself by demonstrating that she

was forced her to exhaust all of her accrued paid leave in order to remain on full-time

paid status for the Fall Semester of 2021 and thereafter. PSUF 14, 16, 30. In the

absence of court intervention, Plaintiff also would have been forced to give up her

medical benefits as of December 29, 2021 while retaining only limited return to work

rights.

Finally, the uncontroverted record established a causal connection between the

full-time, full-duty policy and the disparate impact on Plaintiff. By applying the full-time,

full-duty policy to Dr. Gardner and denying her request for a remote work

accommodation without considering her individual circumstances, the Defendants

caused Dr. Gardner to exhaust all of her accrued paid leave in order to remain on full-

time paid status for the Fall Semester of 2021 and thereafter, PSUF 14, 16, 30, and, in

the absence of court intervention, forced her to give up her medical benefits as of

December 29, 2021 while retaining only limited return to work rights.

Once Plaintiff establishes these three elements, the burden shifts to Defendants

to identify a business necessity for the challenged policy. "To assert a business

necessity defense, the defendants must show that the allegedly discriminatory qualification requirement is (i) job-related, (ii) consistent with business necessity, and (iii) that performance cannot be accomplished with a reasonable accommodation." *Williams*, 296 F. Supp. 3d at 790 (citing *Bates v. United Parcel Service, Inc.*, 511 F.3d 974, 993 (9th Cir. 2007)). As the Court already explained in detail, *supra*, Defendants failed to demonstrate any of these elements. Therefore, the Court will enter summary judgment in favor of Plaintiff and against the University on Count Five.

In Count Six, Plaintiff has asserted a claim under the RA against the University for interference. This claim is distinct from Plaintiff's claim in Count Six under the RA for retaliation. Plaintiff has moved for summary judgment on only the interference claim, while the University has moved for summary judgment on both claims.

Section 12203(b) of the Rehabilitation Act[7] states that "[i]t shall be unlawful to coerce, intimidate, threaten, or **interfere** with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter." (emphasis added). This prohibition "does not operate as a retaliation provision subject to Title VII's burden-shifting framework." *Id*.

While our Court of Appeals has not previously addressed the proper standard for analyzing interference claims under section 12203(b), several other Courts of Appeal have. See e.g., *Menoken v. Dhillon*, 975 F. 3d 1, 9 (D.C. Cir. 2020); *Frakes v. Peoria School District No. 150*, 872 F.3d 545, 550 (7th Cir. 2017); *Brown v. City of Tucson*, 336

---

[7] The standards of the ADA for interference claims govern the standards of a claim for interference under the RA.

F.3d 1181, 1191 (9th Cir. 2003). The latter two cases have adopted the test for anti-interference claims under the Fair Housing Act ("FHA"), 42 U.S.C. § 3617. Our Court of Appeals has held that under the FHA, courts should give the word "interference" its dictionary definition: "'the act of meddling in or hampering an activity or process.'" *See Piotrowski v. Signature Collision Ctrs., LLC*, 2021 WL 4709721, at *2 (E.D. Pa. Oct. 8, 2021) (quoting *Revock v. Cowpet Bay West Condo. Ass'n.*, 853 F.3d 96, 112–113 (3d. Cir. 2017)).

The University clearly meddled with Plaintiff's request for a reasonable accommodation of remote teaching by adopting an inflexible blanket policy that would not permit remote teaching to any high-risk faculty member for the Fall 2021 Semester or thereafter no matter what the individual's physical or mental circumstances were. As a result, Plaintiff's requests for a remote work accommodation were essentially already dead-on-arrival. The University further meddled with Plaintiff's career when it claimed that in-person teaching was an essential function of Plaintiff's job as a full-time Associate Professor, despite the fact that there was no history or written evidence that in-person teaching was ever considered as an essential function of a Associate Professor (or any other faculty member) at the University. Therefore, Plaintiff is entitled to judgment on her interference claim.

The Court now turns to Plaintiff's Count Six claim against the University under the RA for retaliation. "To establish a prima facie case of retaliation..., a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Krouse*

*v. American Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997). See also *Ozlek v. Potter*, 259 F. App'x. 417, 421-22 (3d Cir. 2007) (unpublished opinion) (applying the framework for analyzing a retaliation case under the ADA to a retaliation case under the Rehabilitation Act (quoting *Krouse*, 126 F.3d at 500)). An adverse action is one that could dissuade an objectively reasonable employee from engaging in the statutorily protected conduct. *See Mitchell v. Miller*, 884 F. Supp. 2d 334, 378 (W.D. Pa. 2012) (citing *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 67–71 (2006)). "To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).

According to Count Six of her Complaint, Dr. Gardner engaged in protected activity by (1) requesting reasonable accommodations; (2) opposing KU's alleged "refusal to provide [the] accommodations"; and (3) "standing on her rights through counsel" in this lawsuit. Compl., ¶ 170. She alleges that the University took adverse actions against her by "(1) denying her reasonable accommodations to which she was entitled; (2) refusing to provide her with a remote work accommodation on the pretext that her courses had been reassigned, when there had been no such re-assignment; and (3) refusing to conduct an interactive process or otherwise complying with her legitimate requests for accommodation." *Id.* at 171.

She does not allege the exact nature of the retaliation or when it allegedly occurred. In her Response to Defendants' Cross-Motion for Summary Judgment [ECF 68], she seems to argue that a reasonable jury could find that retaliation occurred after

she filed this suit on March 17, 2022. Specifically, she contends that after her suit was filed, Ms.  Weidman treated Dr. Gardner's requests for remote accommodation in a different manner than she had before the suit was filed, including "direct[ing] DSO to forward Dr. Gardner's file to the Attorney General, and then direct[ing] DSO to ask Dr. Gardner for additional medical information she had already said was unnecessary, and that DSO did not ask for or need."  ECF 68 at p. 16. She also claims that Ms. Weidman never responded to her accommodation request within the normal time limit of two weeks. *Id*.

The Court finds, as a matter of law, that no reasonable jury could construe the Defendant's alleged actions of requiring Plaintiff to submit additional medical documentation, whether justified or not, following the filing of this suit on March 17, 2022 as to be so adverse as to dissuade an objectively reasonable employee from engaging in the statutorily protected conduct of making requests for accommodations. According, Plaintiff has failed to establish a *prima facie* case of retaliation under the ADA/RA and the Defendants' motion for summary judgment will be granted as to the retaliation claim in Count Six. Accordingly, Defendants' motion for summary judgment on Count Six is granted.

In Count Seven, Plaintiff asserts a claim against Dr. Hawkinson for interference and discrimination under the RA. As Defendants correctly argue in their motion for summary judgment, it is well-settled that there is no individual liability under the RA. *Emerson v. Thiel College*, 296 F.3d 184, 190 (3d Cir. 2002) ("Because the individual defendants do not receive federal aid, Emerson does not state a claim against them under the Rehabilitation Act.") (citing *U.S. Dep't of Transp. v. Paralyzed Veterans of*

*Am.*, 477 U.S. 597, 605-06 (1986)). Accordingly, Dr. Hawkinson is entitled to judgment on Count Seven.

In Count Eight, Plaintiff asserts a claim against Dr. Hawkinson under 42 U.S.C. § 1983 for retaliation for deprivation of rights under the RA. In Count Eleven, Plaintiff asserts a  claim against Mr. Pena under 42 U.S.C. § 1983 for Violation of Plaintiff's Rights under the RA. In Count Twelve, Plaintiff asserts a similar claim against Ms. Weidman.

Courts in this Circuit have held that there is no cause of action under 42 U.S.C. § 1983 to address a violation of Section 504 of the RA where, as here, the §1983 claim is based on the same factual predicate as the claim under Section 504 of the RA. *See A.W. v. Jersey City Public Schools,* 486 F.3d at 806 ("There is nothing in Section 504 that . . . causes us to conclude that Congress intended to allow §1983 to be available to remedy Section 504 violations such as those alleged by A.W); *Fanciullo v. U.S. Postal Service*, 2013 WL 5467169, *4 (D.N.J. Sep. 30, 2013) (dismissing § 1983 claims against individual defendant alleging employment discrimination in violation of Section 504 of the Rehabilitation Act). Therefore, Defendants Hawkinson, Pena and Weidman are entitled to summary judgment on Counts VIII, XI, XII, respectively.[8]

Finally, Plaintiff seeks in his prayer for relief emotional and punitive damages. However, emotional and punitive damages are not recoverable under the RA.

---

[8] For a more through discussion of this issue, see *Oross v. Kutztown University*, 2024 WL 83506 at *3, 4 (E.D. Pa. January 8, 2024).

*Cummings v. Premier Rehab Keller, P.L.LC.*, 142 S.Ct. 1562, 1572 (2022); *Barnes v. Gorman,* 536 U.S. 181, 189 (2002).[9]

**CONCLUSION**

This case represents the second time the Court has had to intervene to prevent the Defendants from enforcing what amounts to be clearly a blanket policy that any request by a tenured faculty member at KU to change the course modality, office hours and meetings for the Fall 2021 Semester and thereafter from in-person to remote would be considered a substantial alteration to the course offerings. (A third such case recently settled). KU's actions in formulating an unwritten policy and excluding any consideration of a faculty member's individual circumstances before denying that faculty member's request for a remote accommodation, especially during a nationwide pandemic, clearly violated KU's own written policy concerning requests for accommodation (DIV-002) as well as the RA. While the Court understands Dr. Hawkinson's desire to reopen KU in the Fall Semester 2021 to strictly in-person instruction, Dr. Hawkinson's steadfast refusal to consider the individual circumstances of tenured faculty members such as Dr. Oross and Dr. Gardner and instead enforce a blanket no-exceptions policy against them violates federal disability law.

---

[9] For a more through discussion of this issue, see *Oross v. Kutztown University*, 2024 WL 83506 at *4 (E.D. Pa. January 8, 2024).

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CAROLYN GARDNER** | : **CIVIL ACTION** |
| | : |
| **v.** | : **NO.  22-1034** |
| | : |
| **KUTZTOWN UNIVERSITY, et al.** | : |

## <u>ORDER</u>

   **AND NOW**, this 27th day of March, 2024, it is hereby **ORDERED** that:

1. The Plaintiff's Motion for Partial Summary Judgement [Doc. 43] is **GRANTED**.

2. Judgment is **ENTERED** in favor of the Plaintiff and against Defendant Kutztown University on Counts I, II, III, IV, V and the part of Count VI asserting a claim for interference.

3. The Defendants' Motion for Summary Judgment [Doc. 63] is **GRANTED** in part and **DENIED** in part.

4. The Motion is **GRANTED** as to Counts VII, VIII, XI and XII and the part of Count VI asserting a claim for retaliation.

5. The motion is **DENIED** as to all other Counts.

6. Judgment is **ENTERED** in favor of Defendant Kutztown University and against the Plaintiff on the part of Count VI asserting a claim for retaliation.

7. Judgment is **ENTERED** in favor of Defendant Kenneth Hawkinson and against Plaintiff on Counts VII and VIII of the Complaint.

8. Judgment is **ENTERED** in favor of Defendant Jesus Pena and against Plaintiff on Count XI of the Complaint.

9. Judgment is **ENTERED** in favor of Defendant Jennifer Weidman and against Plaintiff on

Count XII of the Complaint.[1]

**BY THE COURT:**


**/s/ Jeffrey L. Schmehl**
**JEFFREY L. SCHMEHL, J.**

---

[1] There are no Counts IX or X listed in the Complaint.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CAROLYN GARDNER** | **:   CIVIL ACTION** |
| | **:** |
| **v.** | **:   NO.  22-1034** |
| | **:** |
| **KUTZTOWN UNIVERSITY, et al.** | **:** |

**<u>ADDENDUM</u>**

On March 27, 2024, the Court entered a Memorandum and Order in which the Court, *inter alia*, entered summary judgment in favor of the Plaintiff and against Defendant Kutztown University on Count IV of the Complaint asserting intentional discrimination because of disability (pretext). [ECF 79, 80]. During a telephonic status conference on March 28, 2024, counsel for Defendants raised the issue that the Plaintiff did not move in her motion for partial summary judgment [ECF 43] for summary judgment on Count IV of the Complaint and, therefore, the Court should not have entered summary judgment in her favor on that Count.

However, the University did move for summary judgment on Count IV (as well as on all other Counts of the Complaint). [ECF 63]. Therefore, the Court was obligated to consider the entire record to determine whether the University was entitled to summary judgment on that Count. After reviewing the University's brief [ECF 63], Plaintiff's response [ECF 68] and after considering the entire record (much of which was stipulated to by the parties) and after viewing the evidence in favor of Plaintiff, the non-moving party, the Court concluded that the University was not entitled to summary judgment on Count IV and that it was actually Plaintiff who, based on the undisputed

record, was entitled to summary judgment on Count IV.[1] Therefore, rather than simply deny the University's motion for summary judgment on Count IV and listing Count IV for trial, the Court found that since there were no genuine issues as to any material facts regarding Count IV that would render a trial necessary, the Court would just enter summary judgment in favor of Plaintiff on that Count.

In any event, the granting of summary judgment in favor of Plaintiff on Count IV is of little consequence, as the Plaintiff did move for, and the Court granted, summary judgment on Count III of the Complaint which alleged a claim for intentional discrimination because of disability (direct). Plaintiff would be entitled to the same amount of damages whether judgment was granted on Count III, on Count IV or on both Counts.

BY THE COURT:

**/s/ Jeffrey L. Schmehl**
**JEFFREY L. SCHMEHL, J.**

---

[1] The result would have been the same even if the Court had construed the evidence in favor of the University.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CAROLYN GARDNER** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.  22-1034** |
| | : | |
| **KUTZTOWN UNIVERSITY, et al.** | : | |

**<u>FINAL JUDGMENT</u>**

      **AND NOW**, this 21st day of January, 2025, **IT IS HEREBY ORDERED** that the Plaintiff's Motion for a Final Order [Doc. 92] is **GRANTED** in part and **DENIED** in part as follows:

      Plaintiff is awarded the following economic relief as agreed to by the parties:

1. Back Pay in the amount of **$158,605.35.**

2. Retroactive Employer Contributions to Plaintiff's Retirement Fund to October 18, 2022 in the amount of **$14,779.35.**

3. Payment for Lost Value to Retirement Account in the amount of **$1,590.38** which is calculated through July 6, 2024, plus additional payment using the same calculation up to the date of this Order.

4. Retroactive Seniority and/or Restoration of Years of Service from 10/18/2022-3/18/2024.

5. Restoration of 166.3 days of Sick Leave.

6. Restoration of 7 days of Paid Time Off Leave.

7.  Plaintiff shall be fully eligible for FMLA leave for Academic Year 2024-25.

As agreed to by the parties, the statutory interest on the back pay award of $158,605.35 shall be calculated as follows:

Pursuant to 41 P.S. §202, at a rate of 6%, and compounded yearly, from September 1, 2021 through the date of this Order, estimated to be **$21,809.19.**

Plaintiff's request for an additional award of $1725.72 in statutory interest based on "income interruption" arising from Plaintiff returning to work on March 18, 2024 and not receiving her first paycheck until June 14, 2024 is **DENIED**.

Plaintiff's request for an additional award of $7,327.51 to compensate her for "fees and interest for consolidation of credit card debt", "refinance expenses and interest on loan from retirement account" and "capitalized interest on a student loan" is **DENIED**.

In addition, in view of the fact that Plaintiff is still teaching at Kutztown University and many of the named Defendants and other individuals involved in the actions which gave rise to this suit are still employed in their same positions by Kutztown University, and in view of the fact that Defendants continue to insist, even after the Court issued its ruling on the parties' motions for summary judgment [Docs. 79 and 80], that none of their actions in this case violated Section 504 of the Rehabilitation Act, 29 U.S.C. §794, and subsequently even requested the Court's immediate recusal, the Court finds that Plaintiff has demonstrated that there is a real and immediate threat that Defendants will deny any future request by Plaintiff for remote teaching

accommodations. Accordingly, Plaintiff is awarded the following declaratory and injunctive relief as prayed for in her Complaint:

1. The Court declares that Defendants' refusal to provide Plaintiff with a reasonable work accommodation pursuant to its policies and practices precluding remote work accommodation as a matter of general policy without considering Plaintiff's individual circumstances, constituted discrimination against her because of her disabilities under Section 504 of the Rehabilitation Act, 29 U.S.C. §794.

2. The Court further declares that Defendants' actions against Plaintiff constituted intentional discrimination and/or interference with her rights in violation of Section 504 and denied her equal terms and conditions of employment because of her disability.

3. Defendants shall rescind its no-remote work accommodations rule, policy and/or practice pursuant to which it has denied remote accommodations to faculty as a matter of institutional policy that **any** request to change the course modality from in-person to remote would be considered a substantial alteration to the course offerings and would represent an undue hardship to the University. Instead, Defendants must adhere to the requirements of Section 504 of the Rehabilitation Act, the Americans with Disabilities Act and EEOC Regulations that any decision to grant or deny remote accommodations must be based on individualized circumstances unless Defendants can produce individualized evidence that such accommodation

would constitute an undue hardship to the University as defined by those statutory terms.

4. Defendants shall provide Plaintiff with a modified classroom to mitigate her enhanced risk of infection resulting from her disabilities in relation to faculty without such disabilities, unless or until she requests otherwise, and without any further obligation on her part to submit a request for such accommodation to Human Relations.

5. Plaintiff shall provide Defendants with an updated medical report and recommendation from her medical provider every March and September concerning her ongoing need for this accommodation.

6. Defendants shall provide Plaintiff, at her request, with remote access to College, Departmental, and/or Faculty Meetings and other congregate events.

7. In the event Plaintiff's medical provider believes that is unsafe for Plaintiff to teach on campus due to her disability, and upon provision of medical documentation to that effect, Defendants shall provide Plaintiff with a remote and/or hybrid work accommodation in accordance with the recommendation of her medical provider until he/she deems it medically safe for Plaintiff to return to a congregate, on-campus teaching environment.

The Clerk shall mark this case as **TERMINATED** for statistical purposes.

The Court will retain jurisdiction over this matter for a period of 24 months, at the expiration of which the Court will consider whether to retain jurisdiction for an additional period of time.

BY THE COURT:


**/s/ Jeffrey L. Schmehl**
**JEFFREY L. SCHMEHL, J.**